UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| ROLA OUTOUR,<br><br>          Plaintiff,<br><br>    vs.<br><br>ANDREW M. SAUL, Commissioner of<br>the Social Security Administration,<br><br>          Defendant. | 4:19-CV-04119-VLD<br><br><br>MEMORANDUM OPINION<br>AND ORDER |

## INTRODUCTION

Plaintiff, Rola Outour, seeks judicial review of the Commissioner's final decision denying her application for social security disability under Title II of the Social Security Act.[1]

---

[1]SSI benefits are called "Title XVI" benefits, and SSD/DIB benefits are called "Title II" benefits. Receipt of both forms of benefits is dependent upon whether the claimant is disabled. The definition of disability is the same under both Titles. The difference--greatly simplified--is that a claimant's entitlement to SSD/DIB benefits is dependent upon one's "coverage" status (calculated according to one's earning history), and the amount of benefits are likewise calculated according to a formula using the claimant's earning history. There are no such "coverage" requirements for SSI benefits, but the potential amount of SSI benefits is uniform and set by statute, dependent upon the claimant's financial situation, and reduced by the claimant's earnings, if any. There are corresponding and usually identical regulations for each type of benefit. See e.g. 20 C.F.R. §§ 404.1520 and 416.920 (evaluation of disability using the five-step procedure under Title II and Title XVI). Ms. Outour filed her application for Title II benefits only. AR20; 229-31. Her coverage status for SSD benefits expired on March 31, 2017. AR22. In other words, in order to be entitled to Title II benefits, Ms. Outour must prove disability on or before that date.

Ms. Outour has filed a complaint and motion to reverse the Commissioner's final decision denying her disability benefits and to remand the matter to the Social Security Administration for further proceedings. See Docket Nos. 1 and 14.

This appeal of the Commissioner's final decision denying benefits is properly before the court pursuant to 42 U.S.C. § 405(g). The parties have consented to this magistrate judge handling this matter pursuant to 28 U.S.C. § 636(c).

## FACTS[2]

### A. Statement of the Case

This action arises from Ms. Outour's application for Social Security Disability benefits with a protected filing date of January 19, 2016, alleging disability starting January 1, 2011, due to spinal nerve damage, neck and back pain, dizziness, chest pain, arm pain, trouble with legs when standing, trouble using hands, problems sleeping, depression, memory, getting along with others (but good with authority figures), easily angered, mood swings, restless leg syndrome, anemia, headaches, low energy, and generalized pain. AR229, 250, 273-74, 278-79, 295, 300, 322, 327-28, 333, 338, 356. At the hearing on July 10, 2018, Ms. Outour amended her alleged onset of disability to September 9,

---

[2] These facts are recited from the parties' stipulated statement of facts (Docket 13). The court has made only minor grammatical and stylistic changes. Citations to the appeal record will be cited by "AR" followed by the page or pages.

2016, the date of her 50th birthday. AR85-86, 248. Ms. Outour's insurance status for disability insurance benefits (DIB) expired on March 31, 2017. AR22, 234, 292.

Ms. Outour's claims were denied at the initial and reconsideration levels, and Ms. Outour requested an administrative hearing. AR156, 166, 175.

Ms. Outour's administrative law judge hearing was held on July 10, 2018, where different counsel represented Ms. Outour. AR77. An unfavorable decision was issued October 4, 2018, by Administrative Law Judge Christel Ambuehl ("ALJ"). AR19.

At Step One of the evaluation, the ALJ found Ms. Outour had not engaged in substantial gainful activity between September 9, 2016, the amended alleged onset of disability date, and March 13, 2017, Ms. Outour's date of last insurance. AR22.

At Step Two, the ALJ found Ms. Outour had severe impairments, including chronic pain syndrome/fibromyalgia, cervical degenerative disc disease, occipital neuralgia, lumbar minimal dextrorotary scoliosis, and mild sacroiliac degenerative changes with some facet arthropathy changes. AR22. The ALJ found each of those impairments significantly limited Ms. Outour's ability to perform basic work activities as required by SSR 85-28. AR22. The ALJ also found Ms. Outour had medically determinable impairments of hypersomnia, restless leg syndrome, anemia, insomnia, left foot peroneal tendonitis, Achilles tendonitis, posterior tibial tendon dysfunction, gastrocnemius equines, and generalized anxiety disorder but determined that

3

each of those impairments was nonsevere.  AR22-23.  The ALJ noted, "[t]he record [did] not support that any of these impairments have resulted in more than minimal limitations for a period of 12 months or more."  AR23.

The ALJ found Ms. Outour's anxiety caused mild restrictions in understanding, remembering, or applying information; mild limitations in interacting with others; mild limitations in concentration, persistence or maintaining pace, and that she had mild limitations in adapting or managing oneself.  AR23-24.  The ALJ noted, "[t]he record does not indicate that the claimant has difficulty with concentration or memory.  Mental status examinations do not suggest deficits in this area, and the claimant reported that she is able to engage in some cognitively-demanding activities, including researching medical conditions on the Internet (Hearing testimony)."  AR23. The ALJ noted, "the claimant was engaged in a conflict with a neighbor, which could be suggestive of some problems in this area (Exhibit 27(F) . . . [she] has close relationships with her children and friends . . . [and] does not report that she has difficulty in crowded places and, in fact, was able to tolerate a 19-hour flight to visit her mother (Exhibit 27F, p. 2)."  AR24.  The ALJ noted the claimant was "able to care for her personal needs, parent her children, manage household finances, and the like."  AR24.  The ALJ also noted the state agency psychologists opined Ms. Outour's anxiety disorder was nonsevere.  AR24, 131, 149.

At Step Three, the ALJ found Ms. Outour did not have an impairment or combination of impairments that met or medically equaled a Listing.  AR24.

The ALJ "examined all of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1 . . ." AR24. The ALJ did not explicitly mention fibromyalgia, SSR 12-2p, or whether Ms. Outour's chronic pain syndrome/fibromyalgia was equivalent to any Listing in the Step Three evaluation. AR24.

The ALJ determined Ms. Outour had residual functional capacity, ("RFC"), to perform:

> less than the full range of light work as defined in 20 CFR 404.1567(b). The claimant is able to lift and/or carry 20 pounds occasionally and 10 pounds frequently. She can stand and/or walk for about 6 hours in an 8-hour workday. She is able to sit for 6 hours in an 8-hour workday. The claimant is able to occasionally climb, stoop, kneel, crouch and crawl.

AR25. As part of this determination, the ALJ recited portions of the medical, opinion, and testimonial evidence. AR25-29.

The ALJ found at Step Four that Ms. Outour had no past relevant work. AR29.

At Step Five, relying on the testimony of a vocational expert that considered Ms. Outour's RFC and vocational profile, the ALJ stated in the decision the vocational expert testified that an individual could perform the representative example occupations of laundry folder, sub assembler, and inspector hand packager. AR29-30, 107-09.

The ALJ considered the "multiple brief statements" that Ms. Outour was "Disabled for employment" and "myalgia" and "chronic pain" and gave them little weight because they go to a matter reserved for the Commissioner and

they provide no information regarding the functional limitations resulting from Ms. Outour's pain and myalgia. AR28.

The ALJ considered the opinion of consultative examiner, Thomas H. Olson, M.D., who performed a consultative exam in March, 2015, and gave the opinion some weight. AR28. The ALJ asserted Dr. Olson's opinion as to the functional limitations that result from the claimant's impairments were minimal, and predated the amended alleged onset date by over a year, but were consistent with the "lack of objective findings that are prominently reflected in this record." AR28.

The ALJ considered the opinion of consultative examiner, Brian K. Kidman, M.D., who performed a consultative exam and gave the opinion little weight because Dr. Kidman's opinions were "speculated limitations" based on neuropathy that had not been demonstrated in nerve conduction studies or imaging studies. AR28. The ALJ noted Dr. Kidman's opinion was predicated on possible ("If, indeed she does have neuropathies in both of these locations . . .") cervical neuropathy into the left arm and lumbar neuropathy down the left leg. AR28. The ALJ added, "[b]ecause it is based on an impairment that is speculative and not medically determinable, it cannot be given more weight." AR28.

The ALJ considered the opinions of the state agency medical consultants that Ms. Outour could perform a light range of work and gave them great weight because they were consistent with Ms. Outour's "variable complaints

and the lack of corroborating objective evidence" and were also consistent with the examination findings of the consultative examiners.  AR28.

The ALJ found Ms. Outour's statements concerning the intensity, persistence and limiting effects of her alleged subjective symptoms were not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in the decision.  AR26.

The ALJ stated the "very limited objective findings support that the claimant does not have the degree of functional limitation she alleges."  AR29.

Ms. Outour timely requested review and submitted additional medical evidence from Yankton Medical Clinic for treatment on December 18, 2018, to the Appeals Council.  AR73-74, 225.  The Appeals Council denied review making the ALJ's decision final, and Ms. Outour timely filed this action.  AR1-7, 225.

**B.    Medical Evidence (chronological order)**

Ms. Outour saw Dr. Fanta at the Yankton Medical Clinic on September 23, 2011, for neck pain with radiation to the arm at times.  AR605.  A cervical spine MRI obtained due to chronic neck pain following a prior neck trauma in March, 2011, revealed mild cervical spondylosis.  AR392.  Dr. Fanta's assessment was cervical neck strain with injury to the muscles of her neck and physical therapy and Flexeril were prescribed.  AR605.  Ms. Outour had 10 sessions of physical therapy but continued with pain without significant improvement and limited range of motion.  AR897-98.

A lumbar MRI obtained on February 14, 2012, due to left sciatica revealed minimal lower lumbar degenerative spondylosis.  AR1036.

Ms. Outour saw Dr. Raval at the Yankton Medical Clinic on September 6, 2012, by referral from Dr. Peterson for numbness in her neck, left arm, chest and most of her left side.  AR765.  Ms. Outour also had motor weakness, neck stiffness, nocturnal paresthesia, paresthesia, tingling and visual disturbances.  AR765.  Nortriptyline was prescribed.  AR768.

Ms. Outour saw Dr. Fanta at the Yankton Medical Clinic on November 5, 2012, and Dr. Fanta's assessment included cervicalgia, chronic and Dr. Fanta stated Ms. Outour had chronic pain syndrome affecting her neck, arm, and chest and Cymbalta was prescribed.  AR536.

Ms. Outour saw Dr. Peterson at the Yankton Medical Clinic on April 9, 2013, for neck pain and tingling with radiation to the right arm and hand that had started three weeks earlier.  AR485.  Examination revealed: tenderness right flex carpal ulnar, pain on resisted wrist flexion, and positive tinels bilateral wrists.  AR486.  A wrist splint was recommended.  AR487.

Ms. Outour saw Dr. Peterson at the Yankton Medical Clinic on April 30, 2013, for right hand pain that was constant, aggravated by lifting, and she reported both feet burning at night.  AR478.  Examination revealed: positive right elbow tenderness and multiple muscular areas tender to palpation.  AR479.  Dr. Peterson noted widespread diffuse pain and nonrestorative sleep and fibromyalgia was discussed.  AR480.  Lyrica and Robaxin were prescribed and oxycodone continued.  AR480.

Ms. Outour saw Dr. Fanta at the Yankton Medical Clinic on May 28, 2013, for neuropathy in the right hand and lower legs which had started four weeks earlier. AR473. Ms. Outour reported pain in the right hand and "humming" in the lower extremities. AR473. Examination revealed right elbow tenderness and decreased sensation distal upper extremity. AR475. A forearm band was prescribed and she was referred to Dr. Peterson. AR477.

Ms. Outour saw Dr. Peterson at the Yankton Medical Clinic on July 30, 2013, for neck and arm pain and examination revealed cervical spine tenderness, mildly reduced range of motion, right elbow pain with motion, and trigger points bilateral cervical paraspinals. AR454-56. A bilateral trigger point injection was given at the lateral epicondylitis. AR456.

Ms. Outour saw Dr. Peterson at the Yankton Medical Clinic on August 27, 2013, for neck pain with radiation to the arms, wrists, hands and fingers aggravated by sitting too long and injections and narcotics had been tried. AR422. Ms. Outour was having difficulty sleeping due to pain and her children were helping with the laundry. AR422. Examination revealed a fatigued appearance, decreased cervical mobility, decreased sensation left forearm, and cervical extension caused numbness into the upper and lower extremities bilaterally. AR424. A "NCV" EMG showed radiculopathy. AR424, 426. X-rays revealed minimal to mild multilevel degenerative disc disease most pronounced at C3-4 and elongated transverse processes of C7 bilaterally. AR420. A cervical spine MRI obtained on October 30, 2013, revealed C3-4 paracentral disc-osteophyte complex causing mild central canal stenosis and no neural

9

foraminal stenosis. AR421. Dr. Peterson stated that Ms. Outour appeared disabled for employment and suggested a surgical consult with Dr. Adams. AR424.

Ms. Outour saw Dr. Adams at the Yankton Medical Clinic on September 5, 2013, for neck pain with radiation of the pain to both elbows, forearms, and hands which was aggravated by activity, and also had joint pain numbness and tingling. AR415. Ms. Outour had a prior EMG which showed a potential radiculopathy and an MRI was fairly normal. AR417. Lyrica had been unsuccessful and a surgical solution was not seen so conservative treatment was planned with potential injections in the neck with epidurals or Neurontin and Lyrica and other medical management. AR417-18.

Ms. Outour saw Dr. Fanta at the Yankton Medical Clinic on October 9, 2013, for chest discomfort and neck pain and Lyrica was stopped because it had not helped with the pain in her neck and down her arms. AR406. Ms. Outour was given a Depo Medrol and Ketorlac injection. AR408.

Ms. Outour saw Dr. Peterson at the Yankton Medical Clinic on October 21, 2013, for neck, arm and leg pain with worsening pain. AR401. A brace helped with Ms. Outour's arm pain, and her leg pain was a stabbing pain that radiated into her foot. AR401. Savella was considered and reviewed with Dr. Fanta who noted complications of prescribing Savella due to Ms. Outour's tachycardia issues, and Dr. Peterson agreed and deferred the Savella prescription. AR400, 402. Oxycodone had been prescribed the prior month.

AR403.  Ms. Outour followed up with Dr. Peterson again on December 23, 2013, for continued generalized pain.  AR1182.

Ms. Outour saw Dr. Peterson at the Yankton Medical Clinic on January 6, 2014, for foot pain.  AR1179.  An EMG was obtained due to pain, numbness and tingling in the left lower extremity with multiple areas of tenderness on exam and a positive left sitting root test revealed essentially normal results except an isolated abnormality of the denervation of the left peroneus longus.  AR1178.  Muscle relaxants and a referral to Dr. Bassing were planned.  AR1181.

Ms. Outour saw Dr. Bassing at the Yankton Medical Clinic on April 22, 2014, for follow up on her muscle and joint pain.  AR1097.  Ms. Outour had been referred by Dr. Peterson in January, 2014, for diffuse pain, and she continued to have widespread pain affecting her entire body.  AR1097.  No evidence of active inflammatory arthritis was found.  AR1097.  Ms. Outour was taking oxycodone, Lyrica and Parafon for the pain but reported they did not seem to help with her pain.  AR1097.  Examination revealed multiple positive tender trigger points throughout the body, and the assessment was fibromyalgia.  AR1101-02.  Dr. Bassing stated she did not recommend any medications specifically to treat fibromyalgia, as "ultimately none seem to be very helpful."  AR1102.

Ms. Outour saw Dr. Peterson at the Yankton Medical Clinic on June 9, 2014, for follow up on muscle pain aggravated by lifting, movement, pushing and driving.  AR1087.  Examination revealed pain on left wrist extension,

multiple trigger points, and she appeared fatigued. AR1088. Kenalog and lidocaine injections were given and amitriptyline prescribed in place of Lyrica due to possible fatigue side effects. AR1089, 1096.

Ms. Outour saw Dr. Hansen at the Yankton Medical Clinic on June 18, 2014, to follow up on her hypersomnia which had started nine months earlier, and she reported daytime tiredness continued. AR1076. A prior exam for hypersomnia on June 4, 2014, had stated her symptoms had started a year earlier. AR1090. Ms. Outour's assessments were chronic pain syndrome, hypersomnia, and anxiety. AR1079.

Ms. Outour saw Dr. Fournier at the Yankton Medical Clinic on July 17, 2014, to follow up on her chronic Interstitial Cystitis. She was taking Myrbetriq and glucosamine and doing quite well, but noted spicy foods irritated her bladder. AR1072.

Ms. Outour saw Dr. Peterson at the Yankton Medical Clinic on August 18, 2014, with ongoing neck pain and muscle pain in her left elbow. Ms. Outour had received an injection in the left arm on June 9, 2014, that helped about 50% but only lasted a few days. AR1067. Examination revealed left elbow tenderness and trigger points in the left deltoid and left wrist extensor. AR1069. An ultrasound obtained of the left median nerve was normal and not consistent with carpal tunnel syndrome. AR1066. Each of the trigger points were injected with lidocaine. AR1070. Ms. Outour's amitriptyline was stopped due to side effects and Lyrica was prescribed. AR1070.

Ms. Outour saw Dr. Peterson at the Yankton Medical Clinic on September 22, 2014, for pain all over and reported her prior injections had allowed her to sleep for 10 nights. AR1193. Examination revealed cervical spine tenderness and pain with motion, and her right hand had pain with motion, swelling and multiple trigger points. AR1194. Dr. Peterson ordered physical therapy when Ms. Outour was seen on September 24, 2014, with neck pain, decreased cervical range of motion, increased pain with motion and with arm motion above shoulder height, and also decreased strength in upper extremities. AR971.

Ms. Outour saw Dr. Peterson at the Yankton Medical Clinic on October 21, 2014, for leg pain and examination revealed trigger points bilaterally in the forearms and right lumbar paraspinals, diffuse myalgia, and Ms. Outour appeared fatigued. AR1190-01. Each trigger point was injected. AR1192.

Ms. Outour saw Dr. Peterson at the Yankton Medical Clinic on November 4, 2014, to follow up on bilateral leg pain, numbness, tingling and weakness in the arms, and neck pain. AR1315. Trigger points were visualized with ultrasound on the left and right forearms. AR1320.

Ms. Outour saw Dr. Strom at the Yankton Medical Clinic on November 18, 2014, for left leg pain with radiation to the back, numbness, tingling and weakness, aggravated by sitting and left arm pain with numbness, and tingling, aggravated by driving and activity with the arm. AR1017. Ms. Outour had received trigger point injections on November 4th and noticed some improvement. AR1017.

Ms. Outour saw Dr. Peterson at the Yankton Medical Clinic on January 5, 2015. AR1398. Examination revealed decreased sensation left hand. AR1399. Nerve conduction tests were obtained due to tingling and numbness in the 4th and 5th digits of the left hand and results were consistent with a negative screening for left ulnar neuropathy. AR1120. Injections were given in the bilateral cervical paraspinals. AR1400.

Ms. Outour saw Dr. Peterson at the Yankton Medical Clinic on February 2, 2015, for arm pain and she could not turn her neck. AR1390. Examination revealed neck tenderness to palpation, pain on movement, and cervical spine muscle spasms with moderately reduced range of motion. AR1392. Dr. Peterson noted it was a difficult issue of chronic pain and deferred additional injections and suggested a trial of Skelaxin. AR1392.

Ms. Outour saw Dr. Fanta at the Yankton Medical Clinic on February 18, 2015, for abdominal pain and anxiety associated with nausea, difficulty sleeping, and waking up in a panic with difficulty breathing. AR1381. Ms. Outour's assessments included generalized anxiety disorder and Zoloft was prescribed. AR1384-85.

Lumbar x-rays on March 5, 2015, showed "mild degenerative changes." AR1348.

Ms. Outour saw Dr. Peterson at the Yankton Medical Clinic on May 18, 2015, to follow up on neck pain with radiation to the left elbow, forearm and wrist. AR1361. She reported narcotic pain medication was a relieving factor. AR1361. Examination revealed cervical spine tenderness, normal gait, and

14

normal motor strength; and lidocream was prescribed. AR1363. Dr. Peterson advised, "stretching would be beneficial." AR1363.

Ms. Outour saw Dr. Peterson at the Yankton Medical Clinic on August 18, 2015, to follow up on her neck pain and reported that the previously prescribed cream helped for about one hour and then wears off. AR1447. Examination revealed bilateral tenderness of the cervical paraspinals, normal motor strength, and a fatigued appearance. AR1449. Ms. Outour reported experiencing "jerks" when fatigued affecting her upper and lower extremities and neurological referral was recommended. AR1449. Dr. Peterson advised Ms. Outour to "continue with exercise and stretching." AR1449.

Ms. Outour saw Dr. Fournier at the Yankton Medical Clinic on July 22, 2015, to continue follow up on her chronic Interstitial Cystitis. AR1442. Ms. Outour reported pelvic pain and bladder discomfort at times. AR1442. Her pain was improved with Myrbetriq. AR1445. An abdominal physical exam was normal, and Dr. Fournier recommended Ms. Outour reduce her daily coffee intake from eight cups to two cups a day. AR1444-45.

A brain MRI was obtained on October 21, 2015, due to dizziness and abnormal involuntary movements, and revealed mild right mastoiditis and was otherwise negative. AR1417, 1419.

Ms. Outour saw Dr. Fanta at the Yankton Medical Clinic on November 17, 2015, complaining of dizziness aggravated by turning her neck to the left, and had headaches, loss of consciousness, and palpations. AR1463. Her Zoloft dosage had recently been decreased due to possible dizziness side

effects. AR1463. Ms. Outour also complained of nervousness and anxiety and waking up "freaking out" with chest pain and palpations. AR1463. Her physical and psychiatric exam findings were normal. AR1465. Dr. Fanta stated Ms. Outour did appear to have some panic disorder and Zoloft was stopped and Klonopin was prescribed. AR1466.

Ms. Outour saw Dr. Peterson at the Yankton Medical Clinic on December 14, 2015, with continued neck pain and symptoms. AR1467. Ms. Outour reported her headaches were worse and she had facial paresthesia. AR1469. A neurology referral was pending. AR1469. Ms. Outour had full motor strength, no neurological deficits, "ok" tandem gait and appropriate mood and affect. AR1469.

Ms. Outour saw neurologist Mei He, MD, at the CNOS Clinic on December 16, 2015, for increasing jerking movements, and Dr. He felt it was "probably" or "likely" restless leg syndrome. AR1428-29. Dr. He noted a brain MRI "was a negative study intracranially." AR1428. Gabapentin and vitamins were prescribed. AR1430. Ms. Outour's physical exam findings were unremarkable. AR1429.

Dr. Peterson wrote a note on January 5, 2016, (in response to a letter from the state agency reviewing Dr. Outour's disability claim and requesting more information), stating on a prescription form that Ms. Outour was disabled for employment due to myalgia and chronic pain. AR1437.

Ms. Outour saw Dr. Fanta at the Yankton Medical Clinic on January 18, 2016, with ongoing musculoskeletal pain, numbness, and tingling and also

reported continuing episodes of sudden spells of racing chest pain about twice a week, but did feel Klonopin helped overall, and the dosage was increased. AR1471, 1474. Her physical examination showed some patellar tenderness with left knee extension, but normal neck, extremities, and neurological findings. AR1473. She also had appropriate mood and affect. AR1473.

Ms. Outour saw Dr. Fanta at the Yankton Medical Clinic on April 11, 2016, with complaints of chest pain more diffuse than previously reported. AR1493. Examination revealed palpable chest pain mid-sternum to lower sternum and epigastric area, and subscapular area on the left and lateral chest. AR1495. Her neurological, extremity, and psychiatric findings were normal. AR1495. Dr. Fanta's assessment was chronic pain syndrome and fibromyalgia and she did not suspect a cardiac etiology for the pain. But since there was an exertional component and she had a near-syncope with attempt at extreme exertion a cardiology referral was given. AR1497. Dr. Fanta also continued Ms. Outour's gabapentin and noted it was quite sedating for her and probably not tolerated during the day. AR1497.

Ms. Outour saw Dr. Peterson at the Yankton Medical Clinic on June 7, 2016, with continued neck pain, headache, left arm and left leg pain. AR1551. Ms. Outour reported worsening neck pain with increased shooting down the left arm. AR1553. Examination revealed decreased neck range of motion and tightness in the cervical musculature. AR1553. She had full motor strength in her upper extremities. AR1553. She had appropriate mood and affect. AR1553. X-rays of her neck revealed mild to moderate degenerative disc

disease at C3-4 and minimal to mild disc disease elsewhere in the cervical spine. AR1555.

Ms. Outour saw Dr. Irwin, a cardiologist at the Yankton Medical Clinic on July 11, 2016, for chronic chest pain and a cardiac CT angiogram was normal indicating that Ms. Outour's pain was not related to cardiac ischemia. AR1593. Ms. Outour continued to have heart palpations for which a 30-day event recorder showed clear reproduction of the symptoms that did not correspond to underlying cardia dysrhythmia. AR1593. Dr. Irwin advised no further cardiac workup was warranted. AR1593.

Ms. Outour saw Dr. Peterson at the Yankton Medical Clinic on July 11, 2016, with continued constant neck pain that had worsened. AR1594. Examination revealed cervical spine tenderness, and right occipital palpation reproduced patient's headache. AR1596. She had appropriate mood and affect. AR1596. The assessment was occipital neuralgia and the right occipital was injected with Kenalog and lidocaine. AR1596.

Ms. Outour was seen at the CNOS neurology clinic on July 27, 2016, for restless leg syndrome, fainting and leg tremors. AR1666. She had full muscle strength in her upper extremities, no focal weakness, no lower extremity edema, and good balance while walking. AR1740. Ms. Outour was taking Neurontin, clonazepam, and oxycodone for pain at night and reported during the day she still felt tired and unable to do stuff. AR1739. Modafinil (Provigil) was prescribed to help with her excessive tiredness during the day. AR1664, 1740.

Ms. Outour saw Dr. Fanta at the Yankton Medical Clinic on September 2, 2016, for a medication check. AR1574. Ms. Outour reported generally not feeling well and being fatigued. AR1574. Dr. Fanta stated that Ms. Outour had tried several different medications and was intolerant with a lot of dizziness and fatigue. AR1574. Ms. Outour continued to take Klonopin for panic disorder, but still had sudden panic attacks with chest pain and hyperventilation. AR1574. Ms. Outour reported waking up in the morning fatigued and was taking gabapentin for restless leg syndrome. AR1574. Ms. Outour continued to take oxycodone for pain at night and did not feel she would sleep at all without it. AR1574. Ms. Outour's assessments were panic attacks for which Dr. Fanta changed her mediation to Paxil, fatigue and chronic pain syndrome. AR1577.

Dr. Peterson wrote a note on a prescription form dated October 3, 2016, again stating Ms. Outour was disabled for employment due to myalgia and chronic pain. AR1658.

Ms. Outour saw Dr. Fanta at the Yankton Medical Clinic on October 10, 2016, for problems sleeping. AR1707. Ms. Outour reported trouble initiating sleep, difficulty maintaining sleep, and headache and fatigue upon waking. AR1707. Her insomnia was worsened by her anxiety. AR1707. Ms. Outour reported she was "anxious at noc and claustrophobic," had a general feeling of anxiety and even the bathtub scared her. AR1707. Paxil had been tried and not tolerated. AR1707. Dr. Fanta concluded that Ms. Outour's insomnia was caused by her untreated anxiety issues. AR1710. Klonopin was prescribed

again because Ms. Outour had tried several SSRIs with intolerance and was also intolerant to Cymbalta.  AR1710.  A psychology referral was also scheduled.  AR1710.

Ms. Outour saw Dr. Curran at AMG Behavioral Health Yankton on October 11, 2016, for anxiety and panic attack issues.  AR1772.  She had "a lot of complaints currently about her neighbor who apparently has had an ongoing problem with her because of her being from Syria."  AR1772.  Ms. Outour's PHQ-9 score was 15 indicating moderately severe depression.  AR1772, see https://www.modahealth.com/pdfs/PHQ9_Instru.pdf.[3]  Ms. Outour was extremely anxious, but cooperative, and affect congruent with mood and topic.  AR1772.  The diagnosis was generalized anxiety with a Global Assessment of Functioning (GAF) score of 55.  AR1772.

Ms. Outour saw Dr. Peterson at the Yankton Medical Clinic on October 11, 2016, to follow up on her neck pain and reported problems sleeping, more panic attacks and her right arm "jerking" daily.  AR1717.  Examination revealed tender cervical spine and mildly reduced range of motion of the cervical spine.  AR1719.  Ms. Outour had appropriate mood and affect.  AR1719.  Dr. Peterson noted Ms. Outour was seeing psychiatry now, and was given a prescription for biofeedback with psychology supportive services.  AR1720.

---

[3] All internet citations in this opinion last checked on April 3, 2020.

Ms. Outour was seen at the CNOS neurology clinic on October 19, 2016, for restless leg syndrome, right arm and left leg.  AR1663.  Ms. Outour had been unable to tolerate Provigil and had tried Requip but it had not helped.  AR1742.  A note from September 23, 2016, stated Provigil had been denied by Ms. Outour's insurance so Amantadine was prescribed but was discontinued due to side effects including fever and chills.  AR1829, 1831.  Ms. Outour also complained of increasing neck pain all the time and increased spasticity of her neck.  AR1742.  Examination revealed pain on turning her neck especially at the base.  AR1743.  She had no focal weakness and no lower extremity edema.  AR1743.  Gabapentin was continued and an application was made to her insurance for approval of Botox for her cervical dystonia, constant neck pain and sleep problems.  AR1743.  The neurologist diagnosed Ms. Outour with spasmodic torticollis, (diagnosis code G24.3 see https://icd.codes/icd10cm/G243), and prescribed Botox injections.  AR1659-60.  The neurologist stated Ms. Outour's condition was expected to last indefinitely, and her prognosis was "good."  AR1661.

Ms. Outour saw Dr. Curran at AMG Behavioral Health Yankton on October 24, 2016, for counseling with ongoing symptoms.  AR1769.  Ms. Outour reported being very stressed by her neighbor and the session focused on relaxation techniques.  AR1769.  Ms. Outour's diagnosis was modified to add rule out paranoia to generalized anxiety, and her GAF was 55.  AR1769.

Ms. Outour saw Dr. Fournier at the Yankton Medical Clinic on October 26, 2016, to follow up on her interstitial cystitis and reported abdominal pain in the lower left quadrant. AR1723. Ms. Outour reported not feeling well with sharp pelvic pains and had been seen in the emergency room a week earlier where a CT scan demonstrated no hydro or kidney stones, but showed small cysts on both ovaries and possible thickening of the colon walls. AR1723. Examination revealed lower left quadrant tenderness. AR1725. Levaquin was prescribed on the chance Ms. Outour may be developing diverticulitis. AR1726. The abdominal pain had resolved after taking the Levaquin. AR1803.

Ms. Outour saw Dr. Curran at AMG Behavioral Health Yankton on October 31, 2016, for counseling. AR1766. Ms. Outour had travel plans and was concerned about her inability to be in an enclosed place on the plane because the last time she was on a plane she had a conflict with a steward because she could not sit still, and really wanted them to open the door and throw her out. AR1766. Ms. Outour reported she continued to have problems with her neighbor. AR1766. Her GAF was again 55. AR1767.

Ms. Outour was seen at the CNOS neurology clinic on November 8, 2016, to begin Botox injections for her cervical dystonia. AR1745-46. She had no focal weakness in her upper or lower extremities. AR1746. Dr. He noted Gabapentin had helped and that Ms. Outour had tried Lyrica, Requip, and Provigil, which had not helped. AR1746. Ms. Outour contacted the clinic a week later and reported the pain was worse than ever since the Botox injections. AR1825.

Ms. Outour saw Dr. Curran at AMG Behavioral Health Yankton on November 9, 2016, for counseling. AR1764. Ms. Outour reported receiving a Botox injection in her neck earlier in the week and had a migraine headache ever since and had not slept. AR1764. Ms. Outour had dark rings under her eyes, and reported it was hard to focus to do relaxation on her own. AR1764. She reported a trip upcoming to Bahrain, which is a 19-hour flight. AR1764. Dr. Curran noted that Ms. Outour has a really hard time sitting that long and gets really claustrophobic even when the little table is put down for her meals, and the last time she flew the stewardess allowed Ms. Outour to stand in the kitchen area of the plane. AR1764. Her GAF was 55. AR1764.

Ms. Outour saw Dr. Vlach at AMG Behavioral Health Yankton on November 15, 2016, for evaluation of anxiety, sleep and somatic concerns. AR1783. Ms. Outour did not endorse or describe significant depressive symptoms, prominent anxiety, or manic/psychotic symptoms. AR1783. Ms. Outour described problems with her neighbor, but her description did not rise to the level of delusional thinking. AR1783. Ms. Outour reported clonazepam was partially helpful but she still could not sleep well. AR1783. She had good appearance and eye contact; her affect was "loquacious, socially pleasant, possible overly familiar, full range, non-labile, and appropriate;" her thought processes were goal-directed; and her insight was fair. AR1784. Dr. Vlach's diagnoses were movement related sleep disorder, rule out somatoform disorder, rule out depression, rule out anxiety, rule out psychotic

disorder, and Ms. Outour's GAF was 55.  AR1785.  Trazodone was prescribed for sleep.  AR1785.

Ms. Outour saw Dr. Curran at AMG Behavioral Health Yankton on November 15, 2016, for counseling.  AR1781.  Her GAF was 55.  AR1781.

Ms. Outour saw Dr. Fanta at the Yankton Medical Clinic on November 23, 2016, for follow up on her neck pain which was worsening.  AR1796.  Her last MRI in 2013 showed mild cervical disc disease.  AR1796.  Ms. Outour was getting no relief from narcotic analgesics, and recent Botox injections made the pain worse with radiation into her shoulders.  AR1796-98.  A physical exam showed cervical tenderness and decreased range of motion.  AR1798. Oxycodone was stopped and hydrocodone prescribed.  AR1798.  Dr. Fanta noted that both Dr. Peterson and the neurologist were recommending a referral to Mayo Clinic.  AR1798.

Ms. Outour saw Dr. Vlach at AMG Behavioral Health Yankton on December 12, 2016, for medication follow up.  AR1778.  Ms. Outour reported that her sleep had improved since starting trazodone, but that she feels groggy for several hours after waking.  AR1778.  She had a normal gait.  AR1778.  She had goal-directed thought processes, good insight, calm affect, normal speech, and no psychotic/manic symptoms.  AR1778.  Ms. Outour's assessment was movement related sleep disorder and trazodone and counseling were continued.  AR1778.

Ms. Outour saw Dr. Curran at AMG Behavioral Health Yankton on December 15, 2016, for counseling.  AR1776.  Ms. Outour reported she was

leaving the following week to visit her mother. AR1776. She also reported an "ongoing battle" with her neighbor over property lines and garbage left in the yard. AR1776. Examination revealed Ms. Outour was unable to relax, unable to sleep, worried, anxious and affect was congruent with mood and topic, and GAF was 55. AR1776.

Ms. Outour saw Dr. Peterson at the Yankton Medical Clinic on January 10, 2017, to follow up on her ongoing neck pain, and also reported left foot pain. AR1792. Examination revealed left hyper pronation of the ankle with pain-free active and passive range of motion. AR1794. X-rays of her left ankle were normal. AR1794. She was referred to podiatry. AR1794.

Ms. Outour was seen at AMG Podiatry Yankton on January 13, 2017, and following examination was diagnosed with peroneal tendonitis left, Achilles tendonitis left, gastrocnemius equines left greater than right, and posterior tibial tendon dysfunction left. AR1872-74. Shoe inserts and exercises were recommended. AR1875. Ms. Outour's symptoms continued and she was seen again on January 20, 2017. AR1878. She reported doing well with shoe inserts dispensed at her last visit but wanted increased median arch support. AR1877.

Ms. Outour saw Dr. Fanta at the Yankton Medical Clinic on June 6, 2017, for abdominal pain which was burning, sharp and stabbing and Ms. Outour also reported lightheadedness, nausea, weight loss, decreased urinary output, and some chest pain. AR1854. Her physical exam findings were unremarkable except some chest wall pain and diffuse abdominal

tenderness. AR1857. A Depo-Medrol injection was given for the chest wall pain, and the abdominal pain was felt to be an aggravated of her interstitial cystitis, and she continued on hydrocodone for chronic pain. AR1859.

Ms. Outour saw Dr. Peterson at the Yankton Medical Clinic on July 10, 2017, to follow up on her joint pain. AR1850. Ms. Outour complained of pain and tingling in her arms, her left foot continued with symptoms the same as the prior visit, and she complained of left arm neuropathy. AR1850. Upon physical exam, Dr. Peterson found Ms. Outour had passive pain-free range of motion in her left wrist and full muscle strength in her upper extremities. AR1851. Dr. Peterson diagnosed carpal tunnel of the left upper limb based on her examination that revealed positive Tinel's on the left. AR1851-52. Topical lidocaine was prescribed and a brace recommended. AR1852.

On August 7, 2017, nerve conduction testing showed no evidence of left wrist median mononeuropathy, and no evidence of left Martin-Gruber anastomosis. AR1993.

Dr. Peterson wrote a note on a prescription form, dated October 17, 2017, again stating Ms. Outour was disabled for employment due to myalgia and chronic pain. AR2050.

X-rays of Ms. Outour's neck obtained on February 16, 2018, revealed moderate degenerative disc disease at C3-4 and minimal disc disease elsewhere in the cervical spine. AR2038. MRI of the cervical spine obtained the same day revealed C3-4 disc-osteophyte complex causing mild central canal stenosis and

minimal bilateral neural foraminal stenosis, unchanged from November 30, 2016.  AR2039.

Dr. Peterson wrote a note on a prescription form, dated March 26, 2018, again stating Ms. Outour was disabled for employment due to myalgia and chronic pain.  AR2049.

Dr. Peterson wrote a letter on December 18, 2018, stating that Ms. Outour was under her care for chronic pain issues, and had seen multiple specialists over the years regarding her pain syndrome.  AR73.  Dr. Peterson referenced cervical spine and lumbar spine MRIs and findings, EMG findings, neurology records, and records from the CNOS clinic that included "chemo denervation" treatment of Ms. Outour's cervical spine.  AR73-74. Dr. Peterson summarized and stated Ms. Outour had chronic pain issues and received treatment for cervical dystonia and other conditions and she considered Ms. Outour disabled for employment due to musculoskeletal conditions, chronic pain, and poor endurance.  AR74.

## C.    Consultative Medical Examinations (Pre-Alleged Onset Date):

Ms. Outour was referred to Thomas H. Olson, M.D., by the state agency for x-rays and a medical consultation and report on March 5, 2015.[4]  AR1339. Dr. Olson stated he reviewed "many records" regarding Ms. Outour's prior treatment.  AR1342.  Ms. Outour complained of dizziness, lightheadedness, fatigue, weakness in her legs and persistent neck and low back pain.  AR1344.

---

[4] Nowhere in the transcript does it state why this exam, which predates Ms. Outour's application date, was requested or included, but presumably Ms. Outour had a prior disability application.

Examination revealed neck pain and some crepitus on rotation palpated, cervical spine pain particularly on flexion and extension, dorsal and lumbar spine with full range of motion but pain on percussion of lumbar spine and the lower dorsal spine, extremity strength equal but 4/5, otherwise normal findings. AR1344. Ms. Outour had "a full range of motion in all joints in a symmetric fashion both upper and lower extremities." AR1345. Her grip strength and lower extremity strength were normal, her gait and stance were normal, and she had no fatiguing on repetitive motion. AR1345. Cervical spine x-rays show degenerative changes at C3-C4 that is at least moderate, and mild degenerative changes at C7-T1. AR1349. Dr. Olson's impressions included Vitamin D and B deficiencies; interstitial cystitis; irritable colon; dizziness; fibromyalgia; GERD; cervicalgia with moderate degenerative changes at C4-5 otherwise mild degenerative changes in the rest of the cervical spine; chronic pain syndrome; left shoulder pain; lumbago with mild degenerative changes of lumbar spine; and left shoulder x-ray negative. AR1345. Dr. Olson performed a mini-mental exam and Ms. Outour scored 17/29.[5] AR1345; see AR1350-51 (mini-mental status test). Dr. Olson concluded that Ms. Outour's ability to lift and carry was diminished due to neck and lumbar problems; standing, walking and sitting was mildly limited during an 8-hour day;

_____

[5] A mini-mental status score in this range indicates cognitive impairment and/or dementia. See
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2587038/;
https://www.caring.com/examinations/what-does-your-mmse-score-mean/22.

stooping, climbing, kneeling and handling objects were slightly limited due to Ms. Outour's cervical spine. AR1345-46.

Ms. Outour was referred to Brian K. Kidman, M.D., by the state agency for x-rays, a medical consultation and report on June 9, 2016. AR1560. Ms. Outour reported neck and back problems with pain in her entire spine but primarily in the neck and lower back, pain down her left arm to her fingers, and she frequently drops things because of the pain, numbness and tingling in her fingers. AR1560. She reported lifting any more than four pounds with either arm worsens her neck and upper back pain. AR1560. Her low back pain radiates down her left leg to the ankle and is worse if she stands more than 10 minutes or sits more than 15 minutes. AR1560. Examination revealed full range of motion of the C-spine but pain with all motion, pain with rotation of the T-spine 45 degrees, and reduced range of motion of the LS-spine with low back pain. AR1562. X-rays revealed degenerative disc disease at C3-4 and C7-T1, and LS-spine x-rays revealed minimal dextrorotary scoliosis and mild sacroiliac degenerative changes and facet arthropathy changes at L5-S1. AR1562. Dr. Kidman noted Ms. Outour used no assistive device to walk and her mood euthymic. AR1562. She had a normal gait and station; she could squat halfway down and rise from squat without assistance; she got on and off the exam table unremarkably; she made a fist easily; she had strong grip strength (5/5) bilaterally; and she exhibited no obvious weakness in her extremities. AR1562.

Dr. Kidman concluded that although Ms. Outour did have degenerative disc changes in the neck and low back which related to some chronic pain, the bulk of Ms. Outour's pain was related to chronic ligament weakness and possibly fibromyalgia.  AR1563.  Because "[h]er examination findings seem to be a bit out of proportion to the degree of disability that she indicates in her Claimant Interview Form when she only lists three chores that she can do around the house and does not list any self-care activities," Dr. Kidman suspected Ms. Outour's mental health issues were playing a large role, and stated that depression and anxiety can magnify the intensity of pain.  AR1563.  Dr. Kidman recommended an MRI to help better deduce whether Ms. Outour had a cervical neuropathy.  AR1563.  Dr. Kidman stated that if Ms. Outour had neuropathies she would be limited from any kind of repetition with her arms and limit her from even occasional lifting, pushing, and pulling of more than 20 pounds.  AR1563.  Dr. Kidman stated it was unlikely Ms. Outour could stand more than 20 minutes without having to sit and rest for 10-15 minutes before standing again.  AR1563.

**D.    Testimony at the ALJ Hearing**

**1.    Ms. Outour's Testimony**

Ms. Outour testified that she received a bachelor's degree in biology in Syria a long time earlier.  AR87.  Ms. Outour testified she was tested a long time earlier for her ability to read and write in English and her level was like third grade in reading and writing.  AR101.  She said her language was Arabic.  AR102.  Ms. Outour testified that she tried attending college in Yankton and

received F's in all her classes because of trouble with reading and writing. AR103.

Ms. Outour testified she could lift a gallon of milk but would feel it later; her neck would start hurting, she would have headaches, and her left side would start aching. AR90. She drives to and from the grocery store three times per week. AR86. She testified she does not carry groceries, her girls carry them. AR90. Ms. Outour testified it hurts her hands to drive, and using her hands affects her neck. AR91.

When Ms. Outour was asked about standing and walking she testified that in the morning she has to sit on her for bed about 45 minutes and then puts her feet down to the floor to see if she can feel the ground and then stands slowly to see if her legs will carry her. Sometimes she has to lie on the couch for a while if she is weak. AR92. Then she can walk and stand but she needs to take a break then and sit down. AR93.

Ms. Outour testified when she does laundry someone else carries it downstairs and back upstairs for her, and she will fold the laundry one day and then leave it to put away the next day because it hurts to do it all at once. AR93-94. She said she does not clean, her girls or a friend does that for her because using her hands hurts. AR94.

Ms. Outour testified she takes hydrocodone or oxycodone for her pain and it makes the pain go down a little bit. AR97. She testified they switch her between the two narcotic pain medications. AR97. Ms. Outour said her medications make her feel tired and dizzy. AR100.

Ms. Outour testified she gets a rash from her medication and offered to show the ALJ. The ALJ refused, stating she did not need to see it, she was not a doctor and wouldn't even know what she was looking at. AR98.

Ms. Outour testified she had been seeing physiatrist Dr. Judith Peterson for six or seven years. AR99.

Ms. Outour testified she sometimes uses the internet on her phone to research medical issues and symptoms. AR95. She uses Facebook "but [she's] not on it too much." AR96.

## 2. Vocational Expert Testimony

The ALJ asked the vocational expert ("VE"), a hypothetical question that mirrored the limitations included in the RFC determined by the ALJ . The VE testified the individual would be able to perform the work of a laundry folder, DOT #369.687-018, sub assembler, DOT# 729.684-054, and inspector hand packager, DOT #559.687-074. AR107-08.

The VE testified if an individual missed work one day per week they would not be capable of competitive employment. AR111.

## E. Disputed Facts.

The defendant disputes the relevance of the treatment records from September, 2011, to February, 2015, because they predate the amended alleged onset date of September 9, 2016, by more than a year and a half.

The plaintiff asserts the records are relevant since they were in the file considered by the ALJ. Plaintiff notes these records were gathered and included in the administrative record by the defendant and/or the state agency

on behalf of the defendant.  The plaintiff also notes the defendant included in the transcript a consultative examination report that also predated the amended alleged onset date by about a year and a half.  See AR1339-51.

## DISCUSSION

### A.    Standard of Review

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); Biestek v. Berryhill, 587 U.S. ___, 139 S. Ct. 1148, 1154 (2019); Minor v. Astrue, 574 F.3d 625, 627 (8th Cir. 2009). Substantial evidence is defined as more than a mere scintilla, less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support the Commissioner's conclusion.  Biestek, 139 S. Ct. at 1154;  Richardson v. Perales, 402 U.S. 389, 401 (1971); Klug v. Weinberger, 514 F.2d 423, 425 (8th Cir. 1975).  "This review is more than a search of the record for evidence supporting the [Commissioner's] findings, and requires a scrutinizing analysis, not merely a rubber stamp of the [Commissioner's] action."  Scott ex rel. Scott v. Astrue, 529 F.3d 818, 821 (8th Cir. 2008) (cleaned up).

In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it. Minor, 574 F.3d at 627.  The Commissioner's decision may not be reversed merely because substantial evidence would have supported an opposite decision.  Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993); Reed v.

Barnhart, 399 F.3d 917, 920 (8th Cir. 2005). If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Commissioner must be affirmed. Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993). "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record." Mittlestedt v. Apfel, 204 F.3d 847, 851 (8th Cir. 2000) (citations omitted).

The court must also review the decision by the ALJ to determine if an error of law has been committed. Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g). Specifically, a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis. Erroneous interpretations of law will be reversed. Walker v. Apfel, 141 F.3d 852, 853 (8th Cir. 1998)(citations omitted). The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court. Smith, 982 F.2d at 311.

## B.     The Disability Determination and the Five-Step Procedure

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do his previous work, or any

other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

The ALJ applies a five-step procedure to decide whether an applicant is disabled. This sequential analysis is mandatory for all SSI and SSD/DIB applications. Smith v. Shalala, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R. § 404.1520. The five steps are as follows:

- **Step One**: Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). If the applicant is engaged in substantial gainful activity, he is not disabled and the inquiry ends at this step.

- **Step Two**: Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e. whether any of the applicant's impairments or combination of impairments significantly limit his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). If there is no such impairment or combination of impairments the applicant is not disabled and the inquiry ends at this step. NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe. Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 1520a. This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).

- **Step Three**: Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404. 20 C.F.R. § 404.1520(d). If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry. Bartlett v. Heckler, 777 F.2d 1318, 1320 n.2 (8th Cir. 1985). This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work. Heckler v. Campbell, 461 U.S. 458, 460, (1983). If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment* the ALJ must proceed to step four. NOTE: The "special procedure" for mental impairments also applies to determine whether a severe mental impairment meets or equals a Listing. 20 C.F.R. § 1520a(c)(2).

- **Step Four**: Determine whether the applicant is capable of performing past relevant work (PRW). To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe)* to determine the applicant's residual functional capacity (RFC). If the applicant's RFC allows him to meet the physical and mental demands of his past work, he is not disabled. 20 C.F.R. §§ 404.1520(e); 404.1545(e). If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five.

- **Step Five**: Determine whether any substantial gainful activity exists in the national economy which the applicant can perform. To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience. 20 C.F.R. § 1520(f).

## C.    **Burden of Proof**

The plaintiff bears the burden of proof at steps one through four of the five-step inquiry. Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994); Mittlestedt, 204 F.3d at 852; 20 C.F.R. § 404.1512(a). The burden of proof shifts to the Commissioner at step five. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Clark v. Shalala, 28 F.3d 828, 830 (8th Cir. 1994). "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices." Brown v. Apfel, 192 F.3d 492, 498 (5th Cir. 1999). The burden shifting is "a long-standing judicial gloss on the Social Security Act." Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987). Moreover, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five." Stormo v. Barnhart 377 F.3d 801, 806 (8th Cir. 2004).

36

**D.     Medical Evidence Which May Properly Be Considered**

The court takes a short detour before its discussion about each of Ms. Outour's claimed points of error.  In its brief, the Commissioner intimates but does not outright state that the court cannot consider most of the medical records in the file because they either pre-date Ms. Outour's claimed date of onset or post-date her date last insured.  See Commissioner's brief, Docket 16, pp. 1-2 (stating "evidence outside the relevant time period cannot serve as the only support for the disability claim,"  (citing Pyland v. Apfel, 149 F.3d 873, 878 (8th Cir. 1998); 42 U.S.C. §§ 416(i), 423(c)).  The Commissioner has also disputed the relevance of these records in Section E of the FACTS portion of this opinion, above.  The court rejects the Commissioner's invitation to ignore the medical records in the file which pre-date Ms. Outour's claimed date of onset or post-date her date last insured.

The parties appear to agree that Ms. Outour had a previous claim for benefits which was denied in April, 2014, and that Ms. Outour did not appeal from that decision.  See AR259, Docket 16, p. 1, n. 1.

In this case, Ms. Outour's claimed date of onset is September 9, 2016. AR20.  As for medical evidence which pre-dates Ms. Outour's claimed date of onset in this case, the court is not prohibited from considering it.  Hillier v. Soc. Sec. Admin. 486 F.3d 359, 365 (8th Cir. 2007).  In Hillier, the Commissioner argued *res judicata* barred the consideration of a medical report that was considered in the earlier case (an argument the Commissioner does

not make here), but the Eighth Circuit rejected the blanket application of such

a rule:

> Especially in the context of a progressive disease or a degenerative condition, evidence that is offered as proof of a disability, and not found persuasive by an ALJ in a prior proceeding, may be considered in a subsequent proceeding in combination with new evidence for the purpose of determining if the claimant has become disabled since the ALJ's previous decision.  See Groves v. Apfel, 148 F.3d 809, 810-11 (7th Cir. 1998) (stating "there is no necessary inconsistency in finding a claimant not disabled at time *t* but disabled at time *t + 1,"* and thus, there is "no absolute bar to the admission in a second proceeding of evidence that had been introduced in the prior proceeding yet had not persuaded the agency to award benefits."); see also Rogers v. Chater, 118 F.3d 600, 601 (8th Cir. 1997) (noting a claimant generally cannot seek benefits in a subsequent proceeding for any time period for which the prior proceeding had denied benefits).

Hillier, 486 F.3d at 365.

In Hillier, the claimant sought to submit in a subsequent disability

proceeding two doctor's reports that predated his previous claim for benefits—

one that had been evaluated in his prior claim      (Dr. Tyrer) and one that had

not (Dr. Orlicek).  Id.   The court considered both reports, but weighed them

differently for purposes of determining whether Mr. Hillier was currently

disabled:  Dr. Tyrer's report, which had been submitted in the previous

proceeding, could only be considered "as background for new and additional

evidence of deteriorating mental or physical conditions occurring after the prior

proceeding." Id.  Dr. Orlicek's report, though it predated the previous

proceeding, had never been considered in the prior proceeding to determine

whether Mr. Hillier was disabled.  Id.  That evidence, therefore, was new and

could be considered to determine the merits of Mr. Hillier's disability claim during the current proceedings.  Id.

Medical evidence which post-dates the date last insured may likewise be considered. Hanovich v. Astrue, 579 F.Supp.2d 1172, 1185, n. 19 (D. Minn. 2009) (citing Martonick v. Heckler, 773 F.2d 236, 240-41 (8th Cir. 1985)).  In Hanovich, the court noted an ALJ should consider medical records which post-date the date last insured "to determine if they reflect a continuation of disability, corroboration of an earlier diagnosis, or are otherwise probative to whether the claimant suffered a disability for any continuous period prior to the expiration of her insured status."  Id. at n. 19 (citing Martonick, 773 F.2d at 240-41).

This court will therefore consider the entirety of the medical evidence in the administrative record to determine whether the ALJ's denial of Ms. Outour's current claim for disability benefits is supported by substantial evidence.

**E.    The Parties' Positions**

Ms. Outour asserts the Commissioner erred in three ways: (1) the Commissioner failed to identify all of Ms. Outour's severe impairments; (2) the Commissioner failed to properly evaluate whether Ms. Outour met or equaled a Listing at Step 3 of the sequential evaluation; and (3) the Commissioner's RFC formulation is not supported by substantial evidence.[6]

---

[6] This assignment of error contains three sub-parts.

The Commissioner asserts the ALJ's decision is supported by substantial evidence in the record and the decision should be affirmed.  Ms. Outour's assignments of error are discussed below.

### 1. Whether the Commissioner Identified All of Ms. Outour's Severe Impairments

The ALJ identified the following medically determinable severe impairments:  (1) chronic pain syndrome/fibromyalgia; (2) cervical degenerative disc disease; (3) occipital neuralgia; (4) lumbar minimal dextrorotary scoliosis; (5) mild sacroiliac degenerative changes with some facet arthropathy changes.

The ALJ identified the following medically determinable impairments, but deemed them non-severe:  (1) hypersomnia;  (2) restless leg syndrome; (3) anemia; (4) insomnia; (5) left foot peroneal tendinitis; (6) Achilles tendinitis; (7) posterior tibial tendon dysfunction; (8) gastrocnemius equinus; and (9) anxiety disorder.

Ms. Outour asserts the ALJ should have categorized her anxiety disorder as a severe impairment rather than a non-severe impairment.  At step two, it is the claimant's burden to demonstrate a (1) severe and (2) medically determinable impairment, but the burden is not difficult to meet and any doubt about whether the claimant met her burden is resolved in favor of the claimant. Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007); Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001); Quinn v. Berryhill, 2018 WL 1401807 *5 (D.S.D. Mar. 20, 2018); and Dewald v. Astrue, 590 F. Supp. 2d 1184, 1199 (D.S.D. 2008) (citing SSR 85-28)).

An impairment is "medically determinable" if it results from "anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques." See 20 C.F.R. § 404.1521. "Therefore, a physical or mental impairment must be established by objective medical evidence from an acceptable medical source." Id. If an impairment is medically determinable, then the Commissioner next considers whether it is severe. Id.

An impairment is not severe if it does not significantly limit the claimant's physical or mental ability to do basic work activities.[7] See 20 C.F.R. § 404.1522(a). Basic work activities include, but are not limited to: walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, use of judgment; responding appropriately to supervisors and co-workers and usual work situations, dealing with changes in a routine work setting, and understanding, carrying out, and remembering simple instructions. Id. at (b). At step two only medical evidence is evaluated to assess the effects of an impairment on the ability to perform basic work activities. See SSR 85-28. Therefore, subjective complaints by the claimant are normally not part of the step two analysis. Id.

The ALJ noted Ms. Outour's anxiety disorder (AR23) but found it was non-severe. Id. In making this finding, the ALJ relied on the State agency

---

[7] Paradoxically, the Commissioner's regulations do not define "severe," but rather define what is "not severe." The inference from the regulation is that a severe impairment *does* significantly limit a claimant's physical or mental ability to do basic work activities.

psychological opinions (AR124-37; 139-55) which were rendered in July, 2016, and March, 2017, respectively.  AR23; 124-37; 139-55.

The ALJ noted the State agency psychological consultants found Ms. Outour's anxiety disorder caused no more than "mild" limitation in any of the four functional areas known as the "B" criteria:  (1) understanding, remembering, or applying information; (2) concentrating, persisting, or maintaining pace; (3) interacting with others; and (4) adapting or managing oneself.  AR24.  The ALJ stated "because the claimant's medically determinable mental impairments caused no more than 'mild' limitation in any of the functional areas, they were non-severe . . .  the State agency consultant opinions so concluding are given great weight."  Id.

Ms. Outour, however, faults the ALJ for relying upon the State agency psychological consultants' conclusions.  Ms. Outour asserts the State agency psychological consultants did not have the full picture of her mental health treatment at the time they rendered their opinions—which were admittedly based solely on a review of her medical records.  Ms. Outour specifically claims the State agency psychological consultants never saw her treatment records from Yankton Avera Behavioral Health.  Those records are found at AR1761-87 and are dated from October, 2016, through December, 2016.  Id.

The State agency psychological consultant at the initial level did not have the benefit of the Yankton Avera Behavioral Health records because the initial State agency review occurred in July, 2016, and Ms. Outour did not visit Yankton Avera Behavioral Health until October, 2016. AR1772 (first treatment

note from Dr. Curran at Avera Behavioral Health).  The State agency evaluation

on review, however, occurred in March, 2017,--<u>after</u> Ms. Outour had been

treated at Yankton Avera Behavioral Health.  The State agency evaluation on

review (AR139-55), however, <u>does</u> make specific reference to Ms. Outour's

treatment at Yankton Avera Behavioral Health.  <u>See</u> AR148, 150.

The State agency psychologist on review (Stephanie Fuller, Ph.D.) noted

that Ms. Outour was seen at Avera Behavioral Health on 11/09/2016

complaining of insomnia and stress and that the assessment was "GAD."[8]   The

State agency evaluator further noted at AR150 that:

- At recon, new MER[9] indicates some panic attacks and ongoing
  anxiety and was prescribed Paxil and Klonopin; unfortunately,
  was unable to tolerate the Paxil.  She has been tried on
  numerous SSRIs with intolerance and also Cymbalta.  She has
  never been followed by psychology or psychiatry and was
  referred to psychiatry on 10/10/16.  There is no diagnosis of
  depression in the MER.

- Claimant's anxiety is deemed NON-SEVERE.

<u>Id.</u>  The court therefore rejects Ms. Outour's theory that the State agency

psychologist on review (Dr. Fuller) was unaware of Ms. Outour's treatment at

Yankton Avera Behavioral Health at the time the psychologist rendered its

opinion that Ms. Outour's anxiety was nonsevere.  Instead, the record clearly

---

[8] The court assumes "GAD" is an acronym for generalized anxiety disorder.  This assumption is based upon the Avera Behavioral Health noted dated 11/09/2016, to which the State  agency evaluator refers, found at AR1764.   That record indicates Ms. Outour's diagnosis at Axis I is "generalized anxiety, rule out paranoia."  <u>Id.</u>

[9] MER is a commonly used acronym in State agency decisions which stands for "medical evidence of record."

shows Dr. Fuller *was* aware of Ms. Outour's referral to Avera Behavioral Health, and had reviewed at least the first months' worth of Ms. Outour's Avera Behavioral Health records before Dr. Fuller indicated Ms. Outour's anxiety did not rise to the level of a severe impairment.

The issue remains, however, whether the ALJ's designation of Ms. Outour's anxiety disorder as a non-severe impairment is otherwise supported by substantial evidence in the record. Ms. Outour levels several criticisms at the ALJ's reasons for deeming her anxiety disorder as non-severe.

First, she asserts that her consistent GAF scores, assigned at 55, merit of finding of a severe anxiety impairment. The court does not find this argument persuasive.

Ms. Outour explains that a GAF score of 55 represents moderate symptoms or moderate difficulty in social, occupational or school functioning, citing the DSM-IV at p. 34. The GAF uses a scale from 0 to 100 to indicate social, occupational and psychological functioning with a 100 being the most mentally healthy. A GAF of 41 to 50 indicates serious symptoms/impairment in social, occupational, or school functioning while a GAF of 51 to 60 indicates moderate symptoms or difficulty. Nowling v. Colvin, 813 F.3d 1110, 1115 n.3 (8th Cir. 2016). A GAF of 31 to 40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. See https://www.webmd.com/mental-health/gaf-scale-facts.

Although GAFs were still accepted science in the 2010-11 era, both the Eighth Circuit and the Commissioner have recognized since at least 2010 that GAF scores have limited importance. Nowling, 813 F.3d at 1115 n.3. The "Commissioner has declined to endorse the [GAF] score for use in the Social Security and [Supplemental Security Income] disability programs and has indicated that [GAF] scores have no direct correlation to the severity requirements of the mental disorders listings." Id. (quoting Jones v. Astrue, 619 F.3d 963, 973-74 (8th Cir. 2010)). The Diagnostic and Statistical Manual of Mental Disorders ("DSM")-IV (American Psychiatric Assn. 2000) previously contained references to GAF, but explained that GAF scores have no little or no bearing on an individual's occupational and social functioning. Jones, 619 F.3d at 973 (quoting Kornecky v. Comm'r of Soc. Sec., 167 Fed. Appx. 496, 511 (6th Cir. 2006)). The new DSM-5 (May, 2013), dispensed with the GAF score. This court will therefore not find error based upon the ALJ's failure to find Ms. Outour's anxiety disorder severe based upon her GAF score.

Next, the ALJ indicated Ms. Outour's anxiety was not severe because she had not received much treatment for the condition. While the amount of time Ms. Outour had spent in psychiatric counseling was not long (October through December, 2016), the symptoms she described were long-standing and appeared not to be amenable to the medications she had been prescribed. See e.g. AR1783 (11/15/2016 note indicating failed trials of Paxil and Cymbalta because of gastric distress). Ms. Outour directs the court to the following evidence in support of her assertion the ALJ's designation as lack of treatment

for a reason to deem her anxiety non-severe is not supported by substantial

evidence:

- Ms. Outour's psychiatric history included anxiety at least as far back as 2012 when anxiety was present and appeared to be intertwined with her chronic pain and sleep problems. AR742-43; 746.

- Ms. Outour was first prescribed Zoloft in February, 2015, when she had anxiety associated with nausea and was waking with panic and difficulty breathing. AR1381; 1384-85.

- By November, 2015, Ms. Outour's Zoloft dosage had to be reduced because of side effects, and she complained of nervousness, anxiety and waking up "freaking out" with chest pain and palpitations; Zoloft was stopped and Klonopin prescribed. AR1463; 1465-66.

- In November, 2016, Ms. Outour reported she was anxious at night and claustrophobic, had a general feeling of anxiety, and even the bathtub scared her. AR1707. Paxil had been tried and not tolerated, and Dr. Fanta, Ms. Outour's primary care physician, concluded that Ms. Outour's insomnia was caused by her untreated anxiety issues. AR1710. Klonopin was prescribed again because Ms. Outour had tried numerous SSRIs with intolerance and she was also intolerant of Cymbalta. Id. A psychiatric referral was also scheduled. Id.

- Ms. Outour's first psychiatric visit at Yankton Avera Behavioral Health was in October, 2016, for anxiety and panic attack issues. AR1772. She did complain about her neighbor, who she felt had a problem with her being from Syria. AR1772. Ms. Outour's PHQ-9 Score was 15, indicating moderately severe depression. Id. She was extremely anxious, and was diagnosed with generalized anxiety with a Globalized Assessment of Functioning (GAF) score of 55. Id.

- Ms. Outour saw Dr. Peterson, a rehab and pain management specialist, later that same month and reported more panic attacks. AR1717. Dr. Peterson noted that Ms. Outour was being seen in psychiatry and had been given a prescription for biofeedback with psychology supportive services. AR1720.

- Ms. Outour began counseling that same month (October, 2016), and reported issues with her neighbor. Rule out paranoia was added to her anxiety diagnosis. AR1769. Her GAF was continued at 55. Id.

- Ms. Outour continued with additional counseling sessions and her GAF score at these sessions was assessed at 55. AR1764; 1767; 1778 (no GAF assessed on this visit); 1781; 1785.

- Ms. Outour was seen for counseling in December, 2016. Her exam revealed she was unable to relax, unable to sleep, worried, anxious, and her affect was congruent with mood and topic. Her GAF was again 55. AR1776. This is the last counseling note included in the record. Id.

Ms. Outour posits that these medical records reflect she suffered from panic attacks, sleep problems, nervousness, anxiety and waking up "freaking out" with chest pain and palpitations, all manifestations of her anxiety disorder. The court agrees that though Ms. Outour's treatment for her anxiety was not lengthy in time, the mental impairment for which she treated and the symptoms described during this time (nausea, waking with panic, difficulty breathing, panic attacks, unable to relax or sleep) could significantly limit her mental ability to do basic work activities.

Another basis upon which the ALJ found Ms. Outour's anxiety was non-severe is that she suffered no cognitive impairment. But Ms. Outour emphasizes the ALJ ignored the only testing of her mental status which was documented in the record—the mini-mental status exam conducted by Dr. Olson on March 5, 2015.[10] AR1345; 1350-51. This exam revealed a score

_____

[10] Again, this record from March 5, 2015, post-dates the previous disability denial (April, 2014) which was not appealed, so it could not have been considered but rejected as not persuasive by the previous disability adjudicator. That the record pre-dates Ms. Outour's date of alleged onset in

of 17/29, indicating Ms. Outour suffered some sort of cognitive impairment.[11] But the physician who administered the test failed to discuss the results in his report and the ALJ in this case never followed up to discover the significance (if any) of this examination. Instead, the ALJ found that Ms. Outour was only mildly limited in the first functional area of the "B" criteria (the ability to understand, remember, or apply information) because, the ALJ stated, the record "does not indicate that the claimant has difficulty with comprehension or memory." AR23. The ALJ specifically found Ms. Outour had no deficits in this area, and that she was able to engage in some "cognitively demanding activities" such as researching her own medical conditions on the internet. AR23. The ALJ never acknowledged or explained why it did not consider the results of the mini-mental status exam that occurred in March, 2015, which revealed some form of cognitive impairment/dementia.

Next, the ALJ minimized the effects of Ms. Outour's anxiety by describing her therapy as related mostly to the conflict between Ms. Outour and her neighbor. Though the ALJ minimized her anxiety disorder by stating she was merely having trouble getting along with her neighbor, Ms. Outour theorizes

_____

this disability claim (September, 2016) does not preclude this court from considering it as to the merits of this claim, especially because it was never considered in the prior disability proceedings. Hillier, 486 F.3d at 365. That this exam pre-dates Ms. Outour's date of onset does not necessarily indicate the cognitive deficiency (if any) indicated by the test simply disappeared between the date of the test and the alleged date of onset in this case.

[11] On the MMSE, a score of 17 indicates moderate dementia. See https://www.alz.org/alzheimers-dementia/diagnosis/medical_tests.

that absent her severe anxiety, she likely would not have ruminated so excessively about her neighbor's actions and that the trouble with her neighbor was likely another symptom of her severe anxiety.

The ALJ cited as another reason to find Ms. Outour's anxiety non-severe was that she had only mild limitations in the third "B" criteria (interacting with others). The ALJ made this finding because, among other reasons, though she could not find a way to effectively handle the conflict with her neighbor, Ms. Outour had good relationships with her children and friends, and because the ALJ stated she "does not report she has difficulty in crowded places." AR23-24. The medical note dated 10/31/2016 (AR1766) describes Ms. Outour's anxiety/panic attack related to being in a closed-in space that had absolutely nothing to do with her neighbor. Instead, Ms. Outour recounted a long flight in which she became so distressed that she implored the flight attendant to open the plane's door and "throw her out." Id.

The purpose of the "B" criteria is to allow the SSA to evaluate a claimant's mental functioning *in the workplace*. See 20 C.F.R. Subpt. P. App. 1, § 12.00F.1. What is relevant, therefore, is a claimant's ability to interact with supervisors, co-workers, and the public. Id. at 12.00.E.2. The ALJ is to evaluate the claimant's ability to cooperate with others, ask for help when needed, handle conflict with others, state their own point of view, initiate or sustain a conversation, understand and respond to social cues, respond to requests, suggestions, corrections, challenges or criticism, and keep social interactions free of excessive irritability, sensitivity, argumentativeness, or

suspiciousness.  Id.  The ALJ's only explanation for Ms. Outour's obvious inability to deal with conflict and her overblown suspicion of her neighbor was that it "could be suggestive of some problems" in this area.  That Ms. Outour can get along with friends and family is not necessarily indicative of an ability to handle conflict or criticism in the workplace, or to keep her interactions in the workplace free of excessive irritability, sensitivity, argumentativeness, or suspiciousness.  The ALJ offered no explanation for why a close relationship with her family members mitigated the clearly documented problems Ms. Outour had with conflict resolution, suspiciousness, and other basic skills needed to function at an acceptable level in the workplace and outside her circle of family and friends.

Another premise upon which the ALJ based his assignment of "mild" limitations on Ms. Outour's ability to interact with people was that she had not reported any difficulty in crowded places.  AR24.  In support of this statement, the ALJ commented that Ms. Outour was able to tolerate a 19-hour flight to visit her mother.  AR24.  This is at best taken out of context, and at worst simply incorrect.  She had reported becoming so distressed during a long flight that she asked the flight attendant to throw her out of the plane.  AR1766.  She also described anxiety at even being in a bathtub.  AR1707.

Finally, Ms. Outour cites the opinion of Dr. Brian Kidman, an examining consultant hired by the South Dakota Disability Determination Services to conduct an examination and render an opinion in June, 2016.  See AR1560-63.  Dr. Kidman concluded Ms. Outour did suffer from degenerative disc

changes in the neck and facet arthropathy in the lumbar spine.  AR1563.  He

also suspected ligamentous weakness throughout her spine, particularly in the

neck and low back, which caused most of her pain.  Id.  Dr. Kidman noted,

however, that Ms. Outour's examination findings seemed out of proportion to

the degree of disability she indicated in her interview.  Id.  He therefore

suspected her mental issues (anxiety and depression) were magnifying her pain

problems and that they were "playing a large role in this picture."  Id.  The

ALJ, however, dismissed Dr. Kidman's opinion in favor of the State agency

physician opinions—though Dr. Kidman met with and examined Ms. Outour

while the State agency physicians merely reviewed her medical records.[12]

This court has conducted a scrutinizing analysis of the Commissioner's

determination that Ms. Outour's anxiety disorder is not severe.  Scott ex rel.

Scott,  529 F.3d at 821.  That analysis persuades the court that the

Commissioner's conclusion is not based upon substantial evidence on the

record as a whole.   42 U.S.C. § 405(g); Biestek, 139 S. Ct. at  1154; Minor, 574

F.3d at 627.  Remand for further consideration of this issue is required.

### 2. Whether the Commissioner Properly Evaluated the Listings at Step 3 of the Sequential Evaluation

The ALJ found at Step 3 of the sequential evaluation that none of

Ms. Outour's impairments, alone or in combination, met or equaled a Listed

impairment in 20 C.F.R. Part 404, Subpart P, App. 1.  AR24.  The ALJ specified

that it specifically considered Listings 1.04 (Disorders of the Spine) and 11.00

---

[12] Ms. Outour cites the ALJ's failure to properly weigh the medical
evidence as a separate point of error in the DISCUSSION section E.3.c below.

(Neurological disorders), but concluded that the record did not support that the criteria of those listings were supported. Id. The ALJ therefore concluded Ms. Outour did not "have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 . . ." Id.

Step 3 of the sequential evaluation requires the ALJ to determine whether any of the claimant's severe impairments, alone or in combination, meets or equals an impairment that is listed at 20 C.F.R. Part 404, Subpart P, App. 1 (a "Listing"). See 20 C.F.R. § 404.1520(d). If any such impairment or combination of impairments meets or medically equals a Listing, a finding of disability is automatic. Id.; Shontos v. Barnhart, 328 F.3d 418, 424 (8th Cir. 2003).

If the claimant has an impairment that is not among the Listings, the Commissioner is instructed to compare the claimant's findings to a "closely analogous" listed impairment. See 20 C.F.R. § 404.1526(b)(2). The non-listed impairment is medically equivalent to a listed impairment if it is equal in severity and duration to a listed impairment. 20 C.F.R. § 404.1526(a).

Fibromyalgia is not a Listed impairment. Ms. Outour asserts, however, that the ALJ should have found her fibromyalgia to be of Listing level. Ms. Outour asserts the ALJ failed to properly evaluate her fibromyalgia impairment at Step 3 of the analysis because it failed to properly apply Social Security Ruling (SSR) 12-2p. Specifically, Ms. Outour asserts that under SSR 12-2p, the ALJ was required to evaluate whether her fibromyalgia was

medically equivalent to Listing § 14.09D (inflammatory arthritis)—or if not that Listing, whichever other Listing was most analogous.  The ALJ's written decision, Ms. Outour asserts, reveals it did not compare her fibromyalgia to any other specific Listing, which was error.

Social Security Ruling 12-2p instructs the Social Security Administration how to develop evidence in cases where a claimant alleges fibromyalgia as one of their medically determinable impairments.  Part of the SSR includes instruction to the SSA on how to evaluate fibromyalgia claims at Step 3 of the 5-step sequential evaluation process (the Listings).  The SSR states, in relevant part:

> VI.   How do we consider FM in the sequential evaluation process?
>
> As with any adult claim for disability benefits, we use a 5-step sequential evaluation process to determine whether an adult with an MDI of FM is disabled.
>
> ***
> C.     At Step 3, we consider whether the person's impairment(s) meets or medically equals the criteria of any of the listings in the Listing of Impairments in appendix 1, subpart P, of 20 CFR part 404 (appendix 1).  FM cannot meet a listing in appendix 1 because FM is not a listed impairment.  At step 3, therefore, we determine whether FM medically equals a listing (for example, listing 14.09D in the listing for inflammatory arthritis), or whether it medically equals a listing in combination with at least one other medically determinable impairment.

See SSR 12-2p at Section VI.C.

Because there is no Listing for fibromyalgia, therefore, Ms. Outour asserts the ALJ should have, but did not, analyze whether her fibromyalgia met

or equaled Listing § 14.09D as the basis for an award of disability benefits at Step 3.

Listing § 14.09D requires that Ms. Outour show (1) inflammatory arthritis as described in listing 14.00D6 and (2) repeated manifestations of inflammatory arthritis, with at least *two* constitutional symptoms (severe fatigue, fever, malaise, or involuntary weight loss), and *one* of the following at the *marked* level: (a) limitation of activities of daily living, (b) limitations in maintaining social functioning, or (c) limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace. See Listing § 14.09D.

To satisfy the first prong of the test for Listing § 14.09D, Ms. Outour must satisfy the listing for inflammatory arthritis found at listing 14.00D6. This listing covers a "vast array of disorders that differ in cause, course, and outcome." See Listing § 14.00D6. Subpart 6(e)(ii) of Listing § 14.00D states that listing-level severity is shown in Listing § 14.09D "by inflammatory arthritis that involves various combinations of complications of one or more major peripheral joints or other joints, such as inflammation or deformity, extra-articular features, repeated manifestations, and constitutional symptoms or signs. Extra-articular impairments may also meet listings in other body systems." Id. In subpart 6(e)(iii), Listing § 14.00D6 goes on to state that "extra-articular" inflammatory arthritis features may involve any body system, including musculoskeletal, ophthalmologic, pulmonary, cardiovascular, renal, hematologic, neurologic, mental, and immune system. Id.

To satisfy the second prong of the test for Listing § 14.09D, four showings must be made: (1) repeated manifestations of inflammatory arthritis as described above, (2) & (3) two of the listed symptoms and (4) one of the listed limitations at the "marked" level. Id. The evaluation of whether Ms. Outour meets or equals the listing at § 14.09D should be made in the first instance by the ALJ. The ALJ did not consider Listing § 14.09D in its analysis and there are many unanswered questions about the applicability of that Listing to Ms. Outour's impairments that should be answered first by the ALJ.

Fibromyalgia *was* presented by the record, and the ALJ acknowledged it was a severe impairment. Because it was acknowledged as a severe impairment and did not meet or equal any other Listed impairment, the ALJ should have analyzed it under Listing § 14.09 pursuant to SSR 12-2p.

The Commissioner asserts that because (1) only medical records between September 9, 2016, and March 31, 2017, can be considered; and (2) the ALJ correctly determined all of the "B" criteria for Ms. Outour's anxiety disorder posed only "mild" limitations, the ALJ's failure to perform the analysis as to fibromyalgia under § 14.09D is harmless. This is so, argues the Commissioner, because the ALJ's finding of only "mild" limitations in all the "B" criteria automatically precludes a finding that the § 14.09D Listing has been met. This court, however, has already determined that medical records which pre-date the date of onset and post-date the date last insured can properly be considered. It has also determined that the ALJ's finding that Ms. Outour's anxiety disorder was not severe is not supported by substantial evidence.

Additionally, the step-three analysis requires the ALJ to determine whether an impairment *or combination of impairments* meets or equals a Listing. As for the ALJ's analysis of whether fibromyalgia met or equaled a Listing, the ALJ stated "the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the *listed impairments* in 20 C.F.R. Part 404, Subpart P, Appendix 1 . . ." As discussed above, fibromyalgia is *not* a Listed impairment. And, the ALJ did not mention or discuss whether it considered fibromyalgia *in combination with* the specifically Listed impairment under consideration or any other impairments when determining whether that Listed impairment met or equaled the Listing requirements.

This leaves the court unable to determine whether the ALJ properly considered Ms. Outour's severe fibromyalgia impairment *at all* at the Step 3 level of the sequential evaluation. The court is therefore likewise unable to discern whether fibromyalgia was among the impairments or "combination of impairments" that was considered *at all* at this Step.

When the court is unable to determine how the ALJ evaluated fibromyalgia at Step 3, the matter must be remanded. The district courts in this district have consistently interpreted SSR 12-2p to require as much. See e.g. Jockish v. Colvin, 2016 WL 1181680 at *7 (D.S.D. Mar. 25, 2016); Sunderman v. Colvin, 2017 WL 473834 at *7 (D.S.D. Feb. 3, 2017); Wheeler v. Berryhill, 2017 WL 4271428 at **3-4 (D.S.D. Sept. 26, 2017).

In each of these cases, the district court remanded for the ALJ's failure to evaluate at Step 3 whether the claimant's fibromyalgia met or equaled a Listing by comparing it to Listing 14.09D—as instructed in SSR 12-2p. Jockish, 2016 WL 1181680 at *7; Sunderman, 2017 WL 473834 at *7; Wheeler 2017 WL 4271428 at **3-4. In Wheeler, the court explained,

> It is clear the Social Security Administration intended an ALJ to evaluate fibromyalgia under Listing 14.09D. "Social Security Regulations . . . 'are binding on all components of the Administration.'" Carter v. Sullivan, 909 F.2d 1201, 1202 (8th Cir. 1990) (citing 20 C.F.R. § 422.408)). The "agency's failure to follow its own binding regulations is a reversible abuse of discretion." Id. The ALJ's finding cannot be sustained because an error of law occurred.

Wheeler, 2017 WL 4271428 at *4. In this case, as in Jockish, Sunderman, and Wheeler, it is impossible for this court to analyze whether the ALJ's reasoning regarding medical equivalence is sound. Wheeler, 2017 WL 4271428 at *4. For this reason, this case must be remanded for a proper Step 3 analysis pursuant to SSR 12-2p.

### 3. Whether the Commissioner's RFC Formulation is Supported by Substantial Evidence

Residual functional capacity is "defined as what the claimant can still do despite his or her physical or mental limitations." Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001) (citations omitted, punctuation altered). "The RFC assessment is an indication of what the claimant can do on a 'regular and continuing basis' given the claimant's disability. 20 C.F.R. § 404.1545(b)." Cooks v. Colvin, 2013 WL 5728547 at *6 (D.S.D. Oct. 22, 2013). The formulation of the RFC has been described as "probably the most important

issue" in a Social Security case.  McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982), abrogation on other grounds recognized in Higgins v. Apfel, 222 F.3d 504 (8th Cir. 2000).

When determining the RFC, the ALJ must consider all a claimant's mental and physical impairments in combination, including those impairments that are severe and those that are not severe.  Lauer, 245 F.3d at 703; Social Security Ruling (SSR) 96-8p 1996 WL 374184 (July 2, 1996).  Although the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on *all* the relevant evidence . . . a claimant's residual functional capacity is a medical question."[13]  Lauer, 245 F.3d at 703 (citations omitted) (emphasis added).  Therefore, "[s]ome medical evidence must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace."  Id. (citations omitted).

"The RFC assessment must always consider and address medical source opinions."  SSR 96-8p.  If the ALJ's assessment of RFC conflicts with the opinion of a medical source, the ALJ "must explain why the [medical source] opinion was not adopted."  Id.  "Medical opinions from treating sources about

---

[13] Relevant evidence includes:  medical history; medical signs and laboratory findings; the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication); reports of daily activities; lay evidence; recorded observations; medical source statements; effects of symptoms, including pain, that are reasonably attributable to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations.  See SSR 96-8p.

the nature and severity of an individual's impairment(s) are entitled to special significance and may be entitled to controlling weight. If a treating source's medical opinion on an issue of the nature and severity of an individual's impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record, the [ALJ] must give it controlling weight." Id.

Ultimate issues such as RFC, "disabled," or "unable to work" are issues reserved to the ALJ. Id. at n. 8. Medical source opinions on these ultimate issues must still be considered by the ALJ in making these determinations. Id. However, the ALJ is not required to give such opinions special significance because they were rendered by a treating medical source. Id.

"Where there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity." SSR 96-8p. However, the ALJ "must make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." Id.

When writing its opinion, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence. . . In assessing RFC, the adjudicator must . . . explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." Id.

"[T]o find that a claimant has the [RFC] to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Reed, 399 F.3d at 923 (citations omitted, punctuation altered); SSR 96-8p 1996 WL 374184 ("RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis" for "8 hours a day, for 5 days a week, or an equivalent work schedule.").

While it is true that the ALJ is free to formulate the RFC from all the evidence including the opinion evidence and the medical records, it is also established law that the ALJ may not substitute its own opinions for those of the physician. Finch v. Astrue, 547 F.3d 933, 938 (8th Cir. 2008), nor may the ALJ "play doctor" or rely on its own interpretation of the meaning of the medical records. Pate-Fires v. Astrue, 564 F.3d 935, 946-47 (8th Cir. 2009).

These principles were recently reaffirmed in Combs v. Berryhill, 878 F.3d 642, 647 (8th Cir. 2017). In Combs, the claimant alleged disability as a result of combined impairments of rheumatoid arthritis, osteoarthritis, asthma, and obesity. Id. at 643. The only medical opinions in the file regarding Ms. Combs' RFC were from two state agency physicians who had never treated or examined Ms. Combs. Id. at 644. Those physicians instead based their opinions on their review of Ms. Combs' medical records. They gave differing opinions as to Ms. Combs' RFC (one opined she was capable of light duty work, while the other opined she was capable of only sedentary work). Id. at 645.

In deciding which opinion to credit, the ALJ found Ms. Combs' subjective complaints not entirely credible based upon the ALJ's own review of her medical records and notations therein which indicated she was in "no acute distress" and that she had "normal movement of all extremities." Id. The state agency physicians apparently did not base their opinions on these observations. Ms. Combs asserted the ALJ should have contacted the physicians for clarification of what the notations meant rather than rely upon its own inferences. Id. at 646.

The Eighth Circuit agreed, concluding the ALJ erred by relying on its own inferences as to the relevance of the two phrases "no acute distress" and "normal movement of all extremities" as it was significant to her conditions. Id. at 647. The court found the relevance of these medical terms was not clear in terms of Ms. Combs' ability to function in the workplace, because her medical providers also consistently noted in their treatment records that she was had rheumatoid arthritis, prescribed medication for severe pain, and noted trigger point and joint pain with range of motion. Id. So, by relying on its own interpretation of "no acute distress" and "normal movement of all extremities," in terms of Ms. Combs' RFC, the ALJ failed to fulfill his duty to fully develop the record. Id.

Additionally, SSR 96-8p instructs ALJs how to determine RFC and how to explain their determinations. That ruling contains requirements for the ALJ's narrative discussion. One of those requirements is that the RFC assessment must "include a resolution of any inconsistencies in the evidence

as a whole . . .” Id. at p. 13.  Another is that “[t]he RFC assessment must

always consider and address medical source opinions.  If the RFC assessment

conflicts with an opinion from a medical source, the adjudicator must explain

why the opinion was not adopted.” Id. at p. 14.

The ALJ formulated Mr. Outour’s RFC as follows:

> The claimant has the residual functional capacity to perform
> less than a full range of light work as defined in 20 CFR
> 404.1567(b).  The claimant is able to lift  and/or carry 20
> pounds occasionally and 10 pounds frequently.  She can
> stand and/or walk for about 6 hours in an 8-hour workday.
> She is able to sit for 6 hours in an 8-hour workday.  The
> claimant is able to occasionally climb, stoop, kneel, crouch,
> and crawl.

AR25.  Ms. Outour asserts the ALJ’s formulation of her RFC is not supported

by substantial evidence for three reasons, discussed below.

### a. Whether the Commissioner Properly Determined the Limitations Presented by Ms. Outour’s Fibromyalgia

Ms. Outour asserts the ALJ failed to properly acknowledge the

limitations presented by her fibromyalgia, which the ALJ recognized was a

severe impairment.  The Social Security Administration has published a

ruling[14] (SSR 12-2p) regarding how to administer cases in which one of the

claimant’s medical impairments is fibromyalgia.  Ms. Outour posits that the

ALJ neither acknowledged the existence of SSR 12-2p in its opinion, nor

applied it.  Ms. Outour claims the ALJ failed to properly apply SSR 12-2p

---

[14] Social Security rulings do not have the same force and effect as laws or
regulations, but they are binding on all components of the SSA and are used to
adjudicate Social Security disability cases.  See https://www.disability-
benefits-help.org/glossary/social-security-rulings

because the ALJ did not properly determine whether fibromyalgia presented limitations which should have been incorporated into her RFC.

Ms. Outour asserts the ALJ's failure to properly apply SSR 12-2p is made obvious by its focus on the "objective" or "normal" medical examinations and test results, rather than the symptoms that are associated with fibromyalgia, which is contrary to the instruction provided by SSR 12-2p. See e.g. AR26, 27 (ALJ discusses lack of objective evidence to support her claims, physical exams which show range of motion and strength is intact, grip strength is normal, sensory exams show no loss of sensation in feet, normal gait, nerve conduction testing within normal limits, normal physical exam supports a light duty RFC).

These repeated references to normal exam results rather than the various symptoms which can be associated with fibromyalgia, asserts Ms. Outour, indicate the ALJ really did not understand the nature of fibromyalgia. Instead, Ms. Outour argues, the ALJ should have done what SSR 12-2p mandates, which is to examine the record for "widespread pain and other symptoms *associated* with FM" which may result in exertional and nonexertional limitations. See SSR 12-2p, Section VI(E)(1) (emphasis added). These associated symptoms can include widespread pain and chronic fatigue, cognitive memory problems ('fibro fog"), waking un-refreshed, depression, anxiety disorder, irritable bowel syndrome, irritable bladder syndrome, interstitial cystitis, TMJ disorder, reflux disorder, migraines, and restless leg syndrome. See SSR 12-2p, Section II (B)(2).

The Commissioner responds that the ALJ properly determined the limitations (or lack thereof) presented by Ms. Outour's fibromyalgia and incorporated them into her RFC. This is so, the Commissioner argues, because the ALJ properly considered the <u>Polaski</u>[15] factors (i.e. factors other than the objective medical evidence), including: the claimant's work history; the observations of the treating and examining physicians concerning daily activities; duration, frequency and intensity of pain; precipitating and aggravating factors; dosage effectiveness, and side effects of medication; and functional restrictions. <u>See</u> <u>also</u> 20 C.F.R. § 404.1529(c)(3) (regulation codifying the <u>Polaski</u> factors). Specifically, the Commissioner cites Ms. Outour's relatively conservative course of medical treatment, her work history, her medication regimen, and her activities of daily living. <u>See</u> Commissioner's brief, Docket No. 16, at pp. 15-16 (citing the ALJ's decision at AR27-29).

The ALJ discussed Ms. Outour's treatment history at AR27. The ALJ stated she had relied primarily on conservative methodologies, but the ALJ did not indicate that any physician had recommended or prescribed a more aggressive medical or surgical procedure which would have been more effective to treat her pain or which Ms. Outour had refused to undergo. Likewise, the ALJ acknowledged Ms. Outour had "been maintained on a number of medications, including narcotic pain relivers. *The use of such potent*

---

[15] <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984).

*medications lends some support to her allegations.*" Id. (emphasis added).  The

ALJ's discussion of Ms. Outour's treatment history, however, concluded with a

circle back to the lack of objective medical evidence.

> Workups were repeatedly negative, and the sporadic nature of
> her complaints suggests a waxing and waning pattern of pain.
> While this is not inconsistent with the claimant's fibromyalgia
> diagnosis, the inconsistent complaints in the context of
> *essentially normal physical examinations* tends to support the
> light RFC set forth above. (Emphasis added).

AR27.

The ALJ's reference to Ms. Outour's medication regimen, as explained

above, was actually supportive of her subjective complaints, because the ALJ

conceded that she used strong narcotic pain medication which did not seem to

have a positive effect on her pain.  See AR27.

The ALJ's discussion of Ms. Outour's activities of daily living likewise

does not support the Commissioner's position.  In support of its assertion

Ms. Outour's subjective pain complaints were not credible, the ALJ cited

Ms. Outour's ability to shovel snow and to take a long flight to visit her mother.

The medical record cited by the ALJ which referenced Ms. Outour shoveling

snow is found at AR1954.  The record does indicate Ms. Outour had been

shoveling snow, but it also indicates that as a result, she was presenting at the

Yankton Medical Clinic for an EMG on her left upper extremity because she

was having tremors in her left hand after she had been using her hand

excessively while shoveling.  Id.

As for the ALJ's reference to the long flight as a reason to discredit her complaints, the court has already explained the ALJ's reference to Ms. Outour's flight to visit her mother is not accurately depicted by the ALJ.

Here is the complete time line of references in the medical record by Ms. Outour to taking a long flight to see her mother: At approximately her third visit to Yankton Avera Behavioral Health on October 31, 2016, (AR1766) Ms. Outour mentioned that she was planning to travel in December but that she was worried about her inability to be in an enclosed place because last time she was on a plane, she had a conflict with the flight attendant. <u>Id.</u> She could not sit still and had to get up and walk, and really just wanted them to open the door and throw her out. <u>Id.</u> When she returned to Yankton Avera Behavioral Health on November 9, 2016, she again mentioned her apprehension about the upcoming 19-hour flight to Bahrain. AR1762. The medical note states, "she really has a hard time sitting that long and gets really claustrophobic even when the little table is put down in front of her for meals. Last time she was allowed by the stewardess to stand in the kitchen even though she offered to serve coffee, etc." <u>Id.</u>[16] The next time Ms. Outour mentioned the overseas flight to visit her family was during her December 12, 2016, visit to Yankton Avera Behavioral Health. AR1778. During this visit, Ms. Outour described the upcoming flight as 15-hours long, and inquired

_____

[16] This note would make more sense if it said she was <u>not</u> allowed to stand in the kitchen. Nevertheless, the court has reproduced it as it appears in the record.

whether she might be allowed to take a larger dose of her trazodone[17] before the flight began.  Id.  Her doctor encouraged her to experiment with larger doses at home before the trip so she would know how the medication would affect her.  Id.  During the next week's visit (the last psychiatric note in the record) (AR1776) Ms. Outour again mentioned the upcoming trip, but did not inquire about medication changes.  Id.  Taken as a whole, therefore, the record evidence regarding Ms. Outour's ability to tolerate a long overseas flight to visit her mother cannot appropriately be placed on the "plus" side of the third "B" criteria—the ability to interact with others.

The ALJ's reference to the opinion evidence likewise focused on whether it was "consistent with the lack of objective findings" in the record.  See e.g. AR28 (discussing why the ALJ decided to give any weight at all Dr. Olson's report—because his observations were "consistent with the lack of objective findings that are prominently reflected in this record.").

The Eighth Circuit has noted that fibromyalgia is a disease which is "chronic, and diagnosis is usually made after eliminating other conditions, as there are no confirming diagnostic tests . . . We have long recognized that

---

[17] Trazodone is used to treat depression. It may help to improve your mood, appetite, and energy level as well as decrease anxiety and insomnia related to depression. Trazodone works by helping to restore the balance of a certain natural chemical (serotonin) in the brain.
https://www.webmd.com/drugs/2/drug-11188/trazodone-oral/details

fibromyalgia has the potential to be disabling." <u>Forehand v. Barnhart</u>, 364

F.3d 984, 987 (8th Cir. 2004) (citations omitted, punctuation altered).

Where the ALJ rejected a claimant's fibromyalgia symptoms and

complaints because they were not "substantiated by objective medical testing"

the Eighth Circuit reversed and remanded the case because the ALJ

"misunderstood fibromyalgia" which likewise adversely affected the ALJ's

formulation of the claimant's RFC analysis. <u>Garza v. Barnhart</u>, 397 F.3d 1087,

1089 (8th Cir. 2005).

> Fibromyalgia is defined as a syndrome of chronic pain of musculoskeletal origin but uncertain cause. <u>Stedman's Medical Dictionary</u>, at 671 (27th ed. 2000). Further, "[t]he musculoskeletal and neurological examinations are normal in fibromyalgia patients, and there are no laboratory abnormalities." <u>Harrison's Principles of Internal Medicine</u>, at 2056 (16th ed. 2005). The American College of Rheumatology nonetheless has established diagnostic criteria that include "pain on both sides of the body, both above and below the waist, [and] point tenderness in at least 11 of 18 specified sites." <u>Stedman's Medical Dictionary</u>, <u>supra</u>.

<u>Johnson v. Astrue</u>, 597 F.3d 409, 410 (1st Cir. 2010).

In <u>Johnson</u>, the treating physician's opinion regarding the claimant's

fibromyalgia and its effect on her ability to work was not given controlling or

even significant weight. <u>Johnson</u>, 597 F.3d at 412. In <u>Johnson</u>, the ALJ

rejected the treating physician's opinion because it relied primarily upon the

claimant's subjective complaints and lacked supporting objective medical

findings. <u>Id.</u> Because of the unique nature of fibromyalgia, however, the First

Circuit criticized the ALJ's reasons for giving little weight to the treating

physician's opinion:

Dr. Ali's "need" to rely on claimant's subjective allegations . . . was not the result of some defect in the scope or nature of his examinations nor was it even a shortcoming. Rather, "a patient's report of complaints, or history, is an essential diagnostic tool" in fibromyalgia cases, and a treating physician's reliance on such complaints "hardly undermines his opinion as to [the patient's] functional limitations." Green-Younger v. Barnhart, 335 F.3d 99, 107 (2d Cir. 2003) (internal punctuation and citation omitted). Further, since trigger points *are* the only "objective" signs of fibromyalgia, the ALJ "effectively [was] requiring objective evidence beyond the clinical findings necessary for a diagnosis of fibromyalgia under established medical guidelines," and this, we think, was error.

Id. at 412 (emphasis in original). The court concluded by finding the RFC formulated by the ALJ was "significantly flawed." Id.

In Rogers v. Commissioner of Soc. Security, 486 F.3d 234, 250 (6th Cir. 2007), the Sixth Circuit likewise reversed and remanded a fibromyalgia case. "[U]nlike medical conditions that can be confirmed by objective medical testing, fibromyalgia patients present no objectively alarming signs. . .[F]ibromyalgia is an elusive and mysterious disease which causes severe musculoskeletal pain . . . [F]ibromyalgia patients manifest normal muscle strength and neurological reactions and have a full range of motion." Id. at 243-44 (citations omitted, punctuation altered). The Rogers court held the ALJ erred by adopting into the RFC opinions of physicians who dismissed the claimant's complaints because they were not substantiated by objective findings. Id. at 244-46. "[I]n light of the unique evidentiary difficulties associated with the diagnosis and treatment of fibromyalgia, opinions that focus solely on objective evidence are not particularly relevant." Id. at 245.

This court has carefully read the ALJ's evaluation of Ms. Outour's fibromyalgia symptoms. The ALJ stated, "[f]inally, her diagnosis of a chronic pain syndrome or fibromyalgia syndrome are supported by her complaints of persistent pain, throughout her muscles and joints." AR26. But then the ALJ continued, "[d]espite these diagnoses, however, the objective evidence does not demonstrate the degree of limitation alleged." Id. It continued, "[a]cross the physical examinations, the claimant's upper and lower extremity range of motion and strength has remained intact." Id. The ALJ noted Ms. Outour's "grip and hand strength are normal, or even strong" and that her "sensory examinations have not confirmed her reports of loss of sensation in the feet or hands." Id. The ALJ continued, "[s]he has been noted to have normal gait and to move and transition well . . ." AR26-27. Also, the ALJ noted Ms. Outour's "[u]pper extremity nerve conduction testing in August, 2017, was within normal limits." AR27. Finally, the ALJ concluded:

> The claimant has reported that she is frustrated with the lack of findings, and the undersigned is cognizant and sensitive to this complaint. However, despite her subjective perception, the record supports that the claimant is not functionally limited with respect to her strength, sensation, or motion.
>
> ***
>
> Workups were repeatedly negative, and the sporadic nature of her complaints suggests a waxing and waning pattern of pain. While this is not inconsistent with claimant's fibromyalgia diagnosis, the inconsistent complaints in the context of essentially normal physical examinations tends to support the light RFC set forth above.

AR27.

As in <u>Garza</u>, <u>Johnson</u>, and <u>Rogers</u>, it appears the ALJ in this case effectively required objective evidence in order to credit her associated symptoms of fibromyalgia. For the reasons explained above, this court is not persuaded that the ALJ's discussion of the <u>Polaski</u> factors mitigated this error. As such, the ALJ misunderstood Ms. Outour's fibromyalgia and as a result, it rejected its associated limitations which may have been necessary in her RFC. Accordingly, the ALJ's formulation of the RFC was "significantly flawed" and this case should be reversed and remanded for further consideration. <u>Garza</u>, 397 F.3d at 1089; <u>Johnson</u>, 597 F.3d at 412; <u>Rogers</u>, 486 F.3d at 243-44.

### b. Whether the Commissioner Properly Determined the Limitations from Ms. Outour's Mental Impairments

Next, Ms. Outour asserts the ALJ failed to properly include in her RFC the limitations presented by her anxiety disorder. The court has already explained above that the case must be remanded for a reexamination of the severity of this impairment. When determining the RFC, the ALJ must consider all a claimant's mental and physical impairments in combination, including those impairments that are severe and those that are not severe. <u>Lauer</u>, 245 F.3d at 703; Social Security Ruling (SSR) 96-8p 1996 WL 374184 (July 2, 1996); 20 C.F.R. § 404.1545(a)(2).

Here, the ALJ acknowledged Ms. Outour's anxiety was at least a non-severe impairment, but the ALJ did not include any mention of mental limitations in her RFC. The ALJ's discussion of Ms. Outour's anxiety impairment appears at AR23-24. The ALJ stated at AR23 that her anxiety "is only minimally limiting and does not significantly impact her functioning." <u>Id.</u>

71

Thereafter, the ALJ identified and analyzed the four "B" criteria:
(1) understanding, remembering or applying information; (2) concentrating, persisting, or maintaining pace; (3) interacting with others; and (4) adapting or managing oneself, finding "mild" limitations in each.  Id. at AR23-24.

The court has already explained above in section E.1 of the DISCUSSION section of this opinion why remand is required at least as to the ALJ's conclusion that Ms. Outour's anxiety caused only mild limitations in categories (1) and (3) of the "B" criteria.  It follows that a reformulation of the RFC will likewise be required on remand to include appropriate limitations presented by Ms. Outour's anxiety disorder.

### c.  Whether the Commissioner Properly Evaluated the Medical Evidence

Finally, Ms. Outour asserts the ALJ did not properly evaluate the medical evidence in her case.  The ALJ weighed the medical expert opinions as follows:

- The AJL considered the opinion of **Thomas Olson, M.D.** who performed a consultative exam in March, 2015, AR1338-51, after the date of Ms. Outour's previous claim for benefits was denied but nearly a year before her current alleged date of onset.  AR20, 28.  Dr. Olson opined Ms. Outour's ability to lift and carry was diminished due to her neck and lumbar problems, but opined on only mild limitations on her ability to stand, walk and sit, and only slight limitation on her ability to stoop, climb, kneel and handle objects.  AR28.  The ALJ gave Dr. Olson's opinion **some weight** because it predated her alleged date of onset, but it was consistent with the lack of objective findings in the record.  Id.

- The ALJ considered the opinion of **Brian Kidman, M.D.**, who performed a consultative examination on June 9, 2016. AR28; AR1557-63.  Dr. Kidman opined that if Ms. Outour had cervical neuropathy into the left arm and lumbar neuropathy into the left leg, she would be limited to lifting, pushing, and pulling 20 pounds occasionally and standing for 20 minutes at

a time.  AR28.  She was noted during Dr. Kidman's exam to have full but painful cervical spine range of motion and was assessed with a strong grip and was able to use her hands for fine and gross manipulation.  Id.  The ALJ gave Dr. Kidman's opinion **little weight** because the ALJ determined Dr. Kidman's limitations were speculated based on a neuropathy that had not been demonstrated in nerve conduction or imaging studies.  Id.

- The ALJ considered the opinion of **Dr. Peterson**, Ms. Outour's treating physiatry/pain management physician.  AR1436-37; 1658; 2048-50; AR28.  Dr. Peterson wrote several notes for Ms. Outour stating she was "disabled from employment" because of her pain symptoms.  Id.  The ALJ gave Dr. Peterson's opinion **little weight**  because it was a matter reserved to the Commissioner and because it failed to provide any information regarding Ms. Outour's functional limitations that resulted from her pain and myalgia.  AR28.

- The ALJ considered the opinions of the **State agency medical consultants**. AR124-37; AR139-55; AR28.  The State agency psychologists opined Ms. Outour's anxiety disorder was non-severe, found all the "B" criteria to pose only mild restrictions, and did not assign any specific limitations based upon her mental impairments.  Id.  The State agency physicians opined that she was capable of carrying/lifting 20 pounds occasionally and 10 pounds frequently.  AR133.  They further opined she was capable of standing/walking 6 hours out of an 8-hour workday, and sitting 6 hours out of an 8-hour workday.  AR133-34.   The State agency physicians stated Ms. Outour could occasionally climb ramps, stairs, ladders, ropes and scaffolds, but was unlimited in balancing.  AR134.  She was limited to occasionally stooping, kneeling, crouching, and crawling.  Id. She had no manipulative, visual, communicative, or environmental limitations.  Id.   The ALJ gave **great weight** to the opinions of the State agency consultants.  AR28.

Medical opinions are considered evidence which the ALJ will consider in determining whether a claimant is disabled, the extent of the disability, and the claimant's RFC.  See 20 C.F.R. § 404.1527.  All medical opinions are evaluated according to the same criteria, namely:

--whether the opinion is consistent with other evidence in
the record;

--whether the opinion is internally consistent;

--whether the person giving the medical opinion examined
the claimant;

--whether the person giving the medical opinion treated the
claimant;

--the length of the treating relationship;

--the frequency of examinations performed;

--whether the opinion is supported by relevant evidence,
especially medical signs and laboratory findings;

--the degree to which a nonexamining or nontreating
physician provides supporting explanations for their
opinions and the degree to which these opinions
consider all the pertinent evidence about the claim;

--whether the opinion is rendered by a specialist about
medical issues related to his or her area of specialty;
and

--whether any other factors exist to support or contradict the
opinion.

See 20 C.F.R. § 404.1527(c)(1)-(6); Wagner v. Astrue, 499 F.3d 842, 848

(8th Cir. 2007).

"A treating physician's opinion is given controlling weight 'if it is well-

supported by medically acceptable clinical and laboratory diagnostic

techniques and is not inconsistent with the other substantial evidence.' "

House v. Astrue, 500 F.3d 741, 744 (8th Cir. 2007) (quoting Reed, 399 F.3d at

920); 20 C.F.R. § 404.1527(c).  "A treating physician's opinion 'do[es] not

automatically control, since the record must be evaluated as a whole.' " Reed,

399 F.3d at 920 (quoting <u>Bentley v. Shalala</u>, 52 F.3d 784, 786 (8th Cir. 1995)).

The length of the treating relationship and the frequency of examinations of the

claimant are also factors to consider when determining the weight to give a

treating physician's opinion. 20 C.F.R. § 404.1527(c). "[I]f 'the treating

physician evidence is itself inconsistent,' " this is one factor that can support

an ALJ's decision to discount or even disregard a treating physician's opinion.

<u>House</u>, 500 F.3d at 744 (quoting <u>Bentley</u>, 52 F.3d at 786; and citing <u>Wagner</u>,

499 F.3d at 853-854; <u>Guilliams v. Barnhart</u>, 393 F.3d 798, 803 (8th Cir.

2005)). "The opinion of an acceptable medical source who has examined a

claimant is entitled to more weight than the opinion of a source who has not

examined a claimant." <u>Lacroix v. Barnhart</u>, 465 F.3d 881, 888 (8th Cir. 2006)

(citing 20 C.F.R. § 404.1527; <u>Shontos,</u> 328 F.3d at 425; <u>Kelley v. Callahan</u>, 133

F.3d 583, 589 (8th Cir. 1998)).

When opinions of consulting physicians conflict with opinions of treating

physicians, the ALJ must resolve the conflict. <u>Wagner</u>, 499 F.3d at 849.

Generally, the opinions of non-examining, consulting physicians, standing

alone, do not constitute "substantial evidence" upon the record as a whole,

especially when they are contradicted by the treating physician's medical

opinion. <u>Id.</u>; <u>Harvey v. Barnhart</u>, 368 F.3d 1013, 1016 (8th Cir. 2004) (citing

<u>Jenkins v. Apfel</u>, 196 F.3d 922, 925 (8th Cir. 1999)). However, where opinions

of non-examining, consulting physicians along with other evidence in the

record form the basis for the ALJ's decision, such a conclusion may be

supported by substantial evidence. <u>Harvey</u>, 368 F.3d at 1016. Also, where a

nontreating physician's opinion is supported by better or more thorough

medical evidence, the ALJ may credit that evaluation over a treating

physician's evaluation.  Flynn v. Astrue 513 F.3d 788, 792 (8th Cir.

2008)(citing Casey v. Astrue, 503 F.3d 687, 691-692 (8th Cir. 2007)).  The ALJ

must give "good reasons" for the weight accorded to opinions of treating

physicians, whether that weight is great or small.  Hamilton v. Astrue, 518

F.3d 607, 610 (8th Cir. 2008); 20 C.F.R. § 404.1527(c)(2).

Certain ultimate issues are reserved for the Agency's determination.

20 C.F.R. § 416.927(e).  Any medical opinion on one of these ultimate issues is

entitled to no deference because it "invades the province of the Commissioner

to make the ultimate disability determination."  House, 500 F.3d at 745 (citing

Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002)).  See 20 C.F.R.

§ 416.927(e)(3).  The ultimate issues reserved to the Agency are as follows:

1.    whether the claimant is disabled;

2.    whether the claimant is able to be gainfully employed;

3.    whether the claimant meets or exceeds any impairment in the
      Listing of Impairments (appendix 1 to subpart P of part 404 of 20
      C.F.R.);

4.    what the claimant's RFC is; and

5.    what the application of vocational factors should be.

See 20 C.F.R. § 416.927(e)(1) and (2); see also Wagner, 499 F.3d at 849

(the ALJ "need not adopt the opinion of a physician on the ultimate issue of a

claimant's ability to engage in substantial gainful employment.") (quoting

Qualls v. Apfel, 158 F.3d 425, 428 (8th Cir. 1998)).  The RFC determination is

specifically noted to be one of those determinations that is an ultimate issue for the Agency to determine.  20 C.F.R. § 416.927(e)(2); <u>Cox v. Astrue</u>, 495 F.3d 614, 619-620 (8th Cir. 2007).

Ms. Outour asserts several ways in which the ALJ's evaluation of the medical evidence is deficient.  First, she notes the discrepancy between the ALJ's decision to give great weight to the opinions of the State agency consultants, while at the same time assigning little weight to the opinion of the physician (Dr. Kidman) whose records the State agency physicians relied to form their opinions.  Again, the State agency physicians never saw or examined Ms. Outour, but instead merely reviewed the medical records of her other physicians.  The State agency physicians formed their opinions solely on a review of  Ms. Outour's medical records, and specifically indicated that in so doing, *they* gave Dr. Kidman's consultative examination *great weight.*  AR133; 155.  But, as noted by Ms. Outour, Dr. Kidman stated it was "unlikely" she would be able to stand more than 20 minutes without taking a 10-15 minute rest, and also stated that if she had neuropathies, she would be limited from any type of upper extremity repetitive use, and would not be able to even occasionally lift, pull, or push more than 20 pounds.  AR1563.   Dr. Kidman recommended MRIs of the neck and lower back to elucidate whether she did indeed have neuropathies.  <u>Id.</u>

The State agency physicians purported to give Dr. Kidman's opinion great weight but honored neither Dr. Kidman's proposed limitations nor his recommendation for further testing.  The ALJ, who is not a physician, gave the

State agency physicians' opinions great weight, but at the same time (1) ignored their failure to honor the limitations recommended by Dr. Kidman, upon whose records they supposedly relied in forming their opinions; and (2) overruled the State agency physicians' purported decision to give Dr. Kidman's opinions great weight, and instead gave Dr. Kidman's opinion only little weight. These discrepancies, urges Ms. Outour, were never explained by the ALJ. On this point, the court agrees with Ms. Outour.

Ms. Outour also argues the ALJ improperly drew its own inferences from the medical evidence. She notes the ALJ discredited her subjective complaints of pain in part because it determined she had "largely relied on conservative methodologies, including medications, for treatment." AR27. Ms. Outour acknowledges she tried multiple treatments to alleviate her pain and other conditions, including the following:

| Medications: | Consults/referrals: | Injections: |
|---|---|---|
| Flexeril | surgical | trigger point |
| Nortriptyline | rheumatologist | epidural |
| Cymbalta | neurology | depo Medrol |
| Lyrica | cardiology | Kenalog and lidocaine |
| Robaxin | psychiatric | Botox |
| Oxycodone | podiatry | |
| Amitriptyline | | |
| Skelaxin | Other: | |
| Zoloft | physical therapy | |
| Lidocream | wrist splints | |
| Klonopin | forearm band | |
| Gabapentin | counseling | |
| Provigil | | |
| Paxil | | |
| Levaquin | | |
| Trazodone | | |
| Hydrocodone | | |
| Topical Lidocaine | | |

But the ALJ cited no medical opinion which suggested the treatment she did undertake was in fact too "conservative," or that, as stated by the ALJ, the absence of any other or further medical treatment supported the RFC as formulated by the ALJ. "Common sense can mislead; lay intuitions about medical phenomena are often wrong." Myles v. Astrue, 582 F.3d 672, 677 (1st Cir. 2009) (cleaned up). See also Combs, 878 F.3d at 647 (ALJ erred by relying on its own interpretation of phrases "no acute distress" and "normal movement of all extremities" in the medical records to determine claimant's credibility for purposes of formulating RFC). The Commissioner counters that the ALJ may consider all the medical source opinions, along with the other record evidence, when determining the RFC. 20 C.F.R. § 404.1527(b); 404.1545(a)(3).

The Commissioner asserts the ALJ had sufficient medical evidence to support the RFC—consisting of the opinions of the consultative examiners (Dr. Olson and Dr. Kidman) and State agency consultants (Drs. Barker and Whittle). And, the Commissioner notes, "there is no requirement that an RFC finding must be supported by a *specific* medical opinion." Hensley v. Colvin, 829 F.3d 926, 932 (8th Cir. 2016) (emphasis added).

Dr. Olson's report is found at AR1342-51. Dr. Olson imposed no specific functional limitations, but indicated Ms. Outour had only "mild" limitations on her ability to walk and sit. AR1345. Dr. Olson also stated, however, that Ms. Outour's ability to lift and carry is "diminished." These somewhat vague statements are not inconsistent with the ALJ's assignment of 20 pounds

occasionally and 10 pounds frequently lift/carry restriction and 6 hours out of an 8-hour workday sitting/standing/walking restriction.  However, the ALJ ignored without explanation Dr. Olson's administration of the MMSE examination or the implication that it indicated Ms. Outour is cognitively impaired.  Likewise, the ALJ indicated it gave Dr. Olson's opinion only "some" weight in any event, so Dr. Olson's opinion does not form the substantial evidence required to support the ALJ's formulation of the RFC.

As for the State agency opinions, they generally do not, standing alone, constitute "substantial evidence" upon the record as a whole, especially when they are contradicted by the treating physician's medical opinion.  Harvey,368 F. 3d  at 1016.  The ALJ must give "good reasons" for the weight accorded to opinions of treating physicians, whether that weight is great or small. Hamilton, 518 F.3d at 610; 20 C.F.R. § 404.1527(c)(2).  The ALJ's failure to explain the disconnect between State agency physicians' limitations and recommendations and the limitations and recommendations of the physician upon whose examination (Dr. Kidman) they purported to rely, along with the ALJ's own inconsistency of assigning great weight to the non-examining State agency physicians while assigning little weight to the opinion of Dr. Kidman— the examining physician upon whose records the State agency physicians based their recommendations—precludes a finding that the ALJ's evaluation of the medical evidence or assignment of weight the medical opinions is based on "good reasoning." Hamilton, 518 F.3d at 610; 20 C.F.R. § 404.1527(c)(2).

The only treating physician in this case to render an opinion about Ms. Outour's ability to work is her physiatrist/pain management physician, Dr. Peterson. Dr. Peterson's opinions, however, were not very helpful because they did not assign specific functional limitations but instead simply indicated Ms. Outour's pain precluded her from working.

Ms. Outour acknowledges the repeated notes in the record from her treating pain specialist (Dr. Peterson) indicating she was "disabled from work" did not provide specific functional limitations which could have been incorporated into the ALJ's formulation of the RFC. Instead, these statements were improper opinions as to an ultimate issue reserved to the Commissioner pursuant to See 20 C.F.R. § 416.927(e)(1) and (2); see also Wagner, 499 F.3d at 849 (the ALJ "need not adopt the opinion of a physician on the ultimate issue of a claimant's ability to engage in substantial gainful employment."). But instead of contacting Dr. Peterson to request further information about specific functional limitations, the ALJ simply rejected Dr. Peterson's opinions altogether. The ALJ must further develop the record if a crucial issue is undeveloped. Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005); McCoy v. Astrue, 648 F.3d 605, 612 (8th Cir. 2011). The ALJ may further develop the record by recontacting a treating source, requesting additional records, ordering a consultative exam, or asking the claimant or someone else for further information. See 20 C.F.R. § 404.1520b; Freeman v. Apfel, 208 F.3d 687, 692 (8th Cir. 2000).

Ms. Outour asserts a crucial issue was undeveloped in this case because the opinions offered by the State agency physicians were unsupported for the reasons explained above, and because Dr. Peterson, though she stated Ms. Outour was unable to work, likewise did not offer specific functional limitations or a detailed explanation for her opinion. The court agrees.

The ALJ filled in the gaps as follows: "the absence of other treatments or aids such as physical or occupational therapy, chiropractic adjustments, massage, reliance on a cane or the like" support the RFC as formulated (AR27). The ALJ concluded by stating, "[w]hile the undersigned is cognizant that pain is subjective, one would expect reliance on a cane, a limping or shuffling gait, muscle atrophy, exquisite tenderness, or other observable findings to corroborate the degree of limitation the claimant reports." AR29.

The Commissioner has provided guidance for evaluating a claimant's subjective complaints of symptoms more generally. See SSR 16-3p. With regard to a claimant's infrequency of treatment or failure to follow prescribed treatment, the Commissioner counsels that it will not find this factor to be contrary to the claimant's described symptoms unless the Commissioner first contacts the claimant for an explanation regarding lack of treatment, or asks the claimant for such an explanation at the ALJ hearing. Id. The Commissioner specifically acknowledges a claimant may not seek treatment or may not follow prescribed treatment because she "may not be able to afford treatment and may not have access to free or low-cost medical services." Id. The Commissioner further teaches it is not enough for an ALJ to recite the

[Polaski] factors. Id. Instead, the ALJ's opinion "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." Id.

The Commissioner has provided even more refined guidance for evaluating a claimant's failure to follow prescribed treatment. See SSR 82-59.[18] When the Commissioner determines a claimant has failed to follow prescribed treatment, the Commissioner must also determine whether the failure to follow treatment was justifiable. Id. The treatment prescribed must be expected to restore the claimant's ability to work. Id. As with SSR 16-3p, the Commissioner promises in SSR 82-59 to give the claimant an opportunity to explain why she has not followed her doctor's advice and why that is important to the disability determination process:

> The claimant . . . should be given an opportunity to fully express the specific reason(s) for not following the prescribed treatment. Detailed questioning may be needed to identify and clarify the essential factors of refusal. The record must reflect as clearly and accurately as possible the claimant's . . . reason(s) for failing to follow the prescribed treatment.
>
> Individuals should be asked to describe whether they understand the nature of the treatment and the probable course of the medical condition (prognosis) with and without the treatment prescribed. The individuals should be

---

[18] SSR 82-59p has been rescinded and replaced with SSR 18-3p. The substance of the two rulings is very similar. SSR 18-3p did not go into effect, however, until October 29, 2018, a few weeks after the ALJ in Ms. Outour's case issued its decision. See https://www.ssa.gov/OP_Home/rulings/di/02/SSR2018-03-di-02.html. So SSR 82-59p remained applicable to Ms. Outour's claim.

> encouraged to express in their own words why the
> recommended treatment has not been followed.  They should
> be made aware that the information supplied will be used in
> deciding the disability claim and that, because of the
> requirements of the law, continued failure to follow prescribed
> treatment without good reason can result in denial or
> termination of benefits.

See  SSR 82-59p, POLICY STATEMENT.

Depending on the claimant's explanation, the Commissioner counsels

that it may be necessary to recontact the treating medical source to

substantiate or clarify what the source told the claimant.  Id.  There are several

claimant explanations for failing to follow recommended treatment that the

Commissioner identifies as justifiable reasons.  Id.  Among those are inability

to afford the treatment and lack of free community resources.  Id.

Where an ALJ believes a claimant does not have justifiable reasons for

refusing recommended treatment, the ALJ is supposed to advise the claimant

*before* a determination of eligibility of benefits is decided; that way, the

claimant can elect to undergo the treatment if desired.  Id.  This prophylactic

measure is necessary for fundamental fairness because, once a disability

application is denied, the claimant may not later undertake to follow the

treatment recommendation and revise the adverse determination.  Id.  An ALJ

may consider whether an examining medical source determines that the

claimant was malingering in assessing the credibility of the claimant's

testimony as to subjective complaints of pain.  Clay v. Barnhart, 417 F.3d 922,

930 n.2 (8th Cir. 2005) (two psychologists' findings that claimant was

"malingering" cast suspicion on the claimant's credibility).

In Ms. Outour's case this procedure was not followed, of course, because there is no evidence that any of the treatment the ALJ faulted Ms. Outour for not having undertaken was ever recommended by any of her treating physicians.

Ms. Outour asserts the ALJ's statements about her failure to undertake further treatment, the fact that she did not have a shuffling gait or limp, and that she did not rely on the use of a cane all rise to the level of the ALJ impermissibly "playing doctor" just as the ALJ did in Combs. In Combs, the court determined the ALJ overstepped by inferring its own meaning to the phrases "no acute distress" and "normal movement of all extremities" to determine the appropriate RFC. Here, the ALJ itself had no medical expertise and no medical expert of record opined that, in order to be considered entirely consistent with her pain complaints, Ms. Outour's medical conditions should require reliance on a cane, a limping or shuffling gait, or muscle atrophy. Likewise, no medical expert opined that physical or occupational therapy, chiropractic adjustments, massage, reliance on a cane or "the like" would have been appropriate or effective to treat her medical impairments.

The ALJ in this case made its own inferences that because Ms. Outour did not use a cane, did not walk with a limp or a shuffling gait, and did not have muscle atrophy, that her pain complaints were not consistent with her medically determinable impairments. No medical expert verified these inferences. Likewise, no medical expert stated that physical therapy, chiropractic adjustments, or reliance on a cane would have improved her

condition or further legitimized her pain complaints. An ALJ may choose between properly submitted medical opinions, but is not permitted to "set his own expertise against that of a physician who testified before him." <u>Combs</u>, 878 F.3d 647; <u>Strongson v. Barnhart</u>, 361 F.3d 1066, 1070 (8th Cir. 2004); <u>Nevland v. Apfel</u>, 204 F.3d at 858; <u>Gober v. Matthews</u>, 574 F.2d 772, 777 (3d Cir. 1978)(the ALJ "may not simply draw his own inferences about plaintiff's functional ability from medical reports."). This court agrees that remand is required in this case for a proper evaluation of the medical opinions.

**F.     Type of Remand**

For the reasons discussed above, the Commissioner's denial of benefits is not supported by substantial evidence in the record. Ms. Outour requests reversal of the Commissioner's decision with remand and instructions for an award of benefits, or in the alternative reversal with remand and instructions to reconsider her case.

Section 405(g) of Title 42 of the United States Code governs judicial review of final decisions made by the Commissioner of the Social Security Administration. It authorizes two types of remand orders: (1) sentence four remands and (2) sentence six remands. A sentence four remand authorizes the court to enter a judgment "affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

A sentence four remand is proper when the district court makes a substantive ruling regarding the correctness of the Commissioner's decision

and remands the case in accordance with such ruling. <u>Buckner v. Apfel</u>, 213 F.3d 1006, 1010 (8th Cir. 2000). A sentence six remand is authorized in only two situations: (1) where the Commissioner requests remand before answering the Complaint; and (2) where new and material evidence is presented that for good cause was not presented during the administrative proceedings. <u>Id.</u> Neither sentence six situation applies here.

A sentence four remand is applicable in this case. Remand with instructions to award benefits is appropriate "only if the record overwhelmingly supports such a finding." <u>Buckner</u>, 213 F.3d at 1011. In the face of a finding of an improper denial of benefits, but the absence of overwhelming evidence to support a disability finding by the Court, out of proper deference to the ALJ the proper course is to remand for further administrative findings. <u>Id.</u>; <u>Cox v. Apfel</u>, 160 F.3d 1203, 1210 (8th Cir. 1998).

In this case, reversal and remand is warranted not because the evidence is overwhelming, but because the record evidence should be clarified and properly evaluated. <u>See also</u> <u>Taylor v. Barnhart</u>, 425 F.3d 345, 356 (7th Cir. 2005) (an award of benefits by the court is appropriate only if all factual issues have been resolved and the record supports a finding of disability). Therefore, a remand for further administrative proceedings is appropriate.

## CONCLUSION

Based on the foregoing law, administrative record, and analysis, it is hereby ORDERED that the Commissioner's decision is REVERSED and REMANDED for reconsideration pursuant to 42 U.S.C. § 405(g), sentence four. Ms. Outour's motion to remand [Docket No. 14] is GRANTED.

DATED this 3rd day of April, 2020.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge